SA/SDD/RMT
F.#2012R01574

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                      12 CR 661 (S-1) (SLT)

AHMED et al.

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ANONYMOUS, PARTIALLY SEQUESTERED JURY

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shreve Ariail
Seth D. DuCharme
Richard M. Tucker
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government submits this memorandum of law in support of its motion for an anonymous, partially sequestered jury and other related protective measures.  Specifically, the government requests that the names, addresses and workplaces of members of both the venire and petit juries not be revealed, that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.  In short, the government asks that the Court empanel an anonymous, partially sequestered jury in this matter.

Anonymous juries have been used routinely in many prominent terrorism cases, including a number of cases tried in the Eastern District of New York.  See, e.g., United States v. Kaziu, 559 F. App'x 32, 37–38 (2d Cir. 2014) (prosecution in relating to the attempted provision of material support to the designated foreign terrorist organization al-Shabaab); see also United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013)  cert. denied, 134 S. Ct. 1321 (2014) (prosecution relating to plot to detonate fuel tanks at John F. Kennedy airport); United States v. Kadir, 718 F.3d 115, 121 (2d Cir.) cert. denied, 134 S. Ct. 160 (2013) and cert. denied sub nom. Defreitas v. United States, 134 S. Ct. 450 (2013) (same); United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2009) (prosecution of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman); United States v. Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917, at *2 (S.D.N.Y. Sept. 30, 2014) (prosecution relating to plot to detonate bombs at the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania).  Courts in this district also have empaneled anonymous juries in cases involving violent gangs and organized crime families. See, e.g.,

2

United States v. Wilson, 04 CR 1016 (NGG), 2013 WL 1091661, at *4 (E.D.N.Y. Mar. 15, 2013).

Many of the same factors that warranted an anonymous jury and other protective measures in those cases compel the same result here. As discussed below, because this case involves charges of terrorist activity, the defendants' contact with members or associates of al-Shabaab, and substantial media attention, a fair trial requires empaneling an anonymous jury and other requested protective measures.

## I.  FACTUAL BACKGROUND

The defendants Ali Yasin Ahmed, Mahdi Hashi and Mohamed Yusuf have been charged with crimes relating to their support for a foreign terrorist organization. More specifically, in the operative indictment, the defendants are charged with providing material support to al-Shabaab, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B, conspiring to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and using a machinegun in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

### A.  Background on al-Shabaab

For at least the past fifteen years, Somalia has lacked a stable central government and has been vulnerable to intense civil and sectarian violence. In 2004, the Transitional Federal Government (TFG) was established under international auspices. A loose coalition of Islamic insurgents known as the Islamic Courts Union (or Council of Islamic Courts) (ICU) fought against the TFG, however, and took control over much of southern Somalia. In early June 2006, the ICU captured Somalia's capital city Mogadishu, and the TFG retreated to Baidoa, Somalia.

3

The ICU, together with an extremist faction of "shock troops" known as al-Shabaab, continued to fight the TFG in Baidoa.  While in control of southern Somalia, the ICU and al-Shabaab are believed to have provided protection and safe haven for al-Qaeda operatives wanted for the 1998 bombings of the United States embassies in Kenya and Tanzania and a 2002 hotel bombing in Kenya.

In late 2006, Ethiopian forces intervened on the TFG's behalf, routed the ICU, and recaptured Mogadishu. With Ethiopian and African Union support, the TFG was reinstalled into power.  Although it initially dispersed in the face of the Ethiopian invasion, al-Shabaab eventually regrouped and initiated a war in Somalia targeting all aspects of the TFG, including police stations, border posts, government facilities and civilian targets, as well as the TFG's Ethiopian and African Union supporters. Al-Shabaab captured several cities and towns in southern Somalia, including parts of Mogadishu itself.  In addition to fighting against the TFG, al-Shabaab also opposed two autonomous regions of northern Somalia known as Puntland and Somaliland.  In late 2008 and early 2009, Ethiopia began to withdraw its troops from Somalia, and al-Shabaab advanced against the TFG.  In late January 2009, al-Shabaab captured Baidoa, and TFG control was reduced to several square blocks in Mogadishu protected by African Union peacekeepers.

Throughout its war against the TFG, the successor Federal Government of Somalia (FGS), and its Ethiopian and African Union supporters, al-Shabaab has used harassment and targeted assassinations of civilians and journalists, improvised explosive devices, rockets, mortars, automatic weapons, and general tactics of intimidation and violence to undermine the Somali government, quell the Somali population, and force the withdrawal of foreign troops; in late 2008, for example, al-Shabaab produced a videotape depicting the slow decapitation of an

4

accused spy.  Al-Shabaab has claimed responsibility for multiple suicide bombing attacks, including an attack on Burundian peacekeepers in Mogadishu on April 8, 2008, and another suicide attack against Burundian peacekeepers on February 22, 2009.  Al-Shabaab also conducted five simultaneous suicide bombings targeting government, Ethiopian, and United Nations facilities in Puntland and Somaliland on October 29, 2008.  One of the suicide bombers, Shirwa Ahmed, was a United States citizen and former Minnesota resident.  Al-Shabaab has declared that its ultimate goal is the imposition of Sharia, or strict Islamic law, throughout Somalia.

On February 26, 2008, the United States Department of State designated al-Shabaab (aka al-Shabab, aka Shabaab, aka the Youth, aka Mujahidin al-Shabaab Movement, aka Mujahideen Youth Movement, aka Mujahidin Youth Movement, aka MYM, aka Harakat Shabab al-Mujahidin, aka Hizbul Shabaab, aka Hisb'ul Shabaab, aka al-Shabaab al-Islamiya, aka Youth Wing, aka al-Shabaab al-Islaam, aka al-Shabaab al-Jihaad, aka the Unity of Islamic Youth) as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended, and as a Specially Designated Global Terrorist ("SDGT") under Section 1(b) of Executive Order 13224, as amended. "Shabaab" is an Arabic word that means "Youth" and is in common use in the Somali language. To date, al-Shabaab remains a designated FTO.

Al-Shabaab has also made numerous public statements demonstrating an intent to harm the United States.  For example, in or about April 2009, al-Shabaab declared that it was responsible for mortar attacks against a U.S. Congressman who had been visiting Somalia.  Similarly, after an al-Shabaab member was killed by what al-Shabaab believed to be a U.S. missile strike in or about May 2008, al-Shabaab leaders declared that the mujahideen would "hunt the U.S. government" and that governments

supporting the United States and Ethiopia should keep their citizens out of Somalia. **In**

addition, on or about April 5, 2008, al-Shabaab declared:

> To the other mujahideen included in the American terrorist
> list: O Mujahideen brothers! . . . May you be successful in
> your jihad and may you frustrate the enemies. May Allah help
> you . . . . Please know, our beloved ones, that we are going
> through a crucial stage, in which the oppressors have crossed
> the line. That is why we call upon you to round up and join
> forces under one leadership and a uniform flag in order to
> frustrate the enemies of Allah and execute his command . . . .
> As a result, our jihad will be stronger and more harmful to our
> enemies.
>
> In conclusion, we say to the patron and protector of the cross,
> America: the wager that you made on the Ethiopians,
> Ugandans, and Burundians in Somalia was a failure, and
> history has proven it. Allah willing, we will attack them, roam
> [through their ranks], cut off every path they will take, chase
> away those who follow them, and fight them as insects and
> wolves. [We] will give them a taste of the heat of flame, and
> throw them into hell.

Violent unlawful attacks by al-Shabaab continue to this day. On July 11, 2010,

three near-simultaneous explosions took place in Kampala, Uganda. The bombs detonated in a

crowded Ethiopian restaurant and a Rugby Club where people were watching the World Cup

final match. The bombing killed approximately 76 civilians, to include one U.S. citizen.

Following this attack, al-Shabaab publicly claimed credit for the attack.

On or about May 30, 2011, Farah Mohamed Beledi ("BELEDI"), a Somali-

American from Minneapolis, was killed by African Union ("AMISOM") forces in Mogadishu,

Somalia. AMISOM troops shot and killed BELEDI as he attempted to enter the AMISOM base

while wearing a "suicide bomber vest." Al-Shabaab claimed responsibility for BELEDI's attack

on the AMISOM peacekeepers. BELEDI was accompanied by another al-Shabaab suicide

bomber who was also killed by AMISOM troops; one AMISOM soldier died in the attack.

On or about October 4, 2011, an unidentified al-Shabaab suicide bomber drove an explosives-laden truck into the checkpoint at Somalia's Ministry of Education.  Approximately 100 people were killed; nearly 100 were injured.  Al-Shabaab claimed responsibility for the attack.

On or about November 1, 2011, two unidentified suicide bombers attacked AMISOM peacekeepers at their base in Mogadishu, killing themselves and approximately eight others.  Al-Shabaab not only claimed responsibility for the attack but also alleged that one of the suicide bombers was a Somali-American from Minneapolis, Minnesota.

On or about February 9, 2012, al-Shabaab effectively joined forces with al-Qaeda when al-Shabaab's leader, Mukhtar Abu al-Zubair, informed al-Qaeda leader Ayman al-Zawahiri that his followers "will march with you as loyal soldiers."  Representatives of al-Shabaab and al-Qaeda released a video purporting to announce the alliance.  In the video, Mukhtar Abu Zubeyr, also known as "Ahmed Abdi Aw Mohamed," and "Godane," then the reputed leader of al-Shabaab, pledged al-Shabaab's allegiance to al-Qaeda, and to Ayman al-Zawahiri, al-Qaeda's named successor to Usama Bin Laden.  In an address directed at Zawahiri, Zubeyr announced:

> O our beloved Emir, on behalf of my brothers in al Shabaab al Mujahideen Movement, commanders and soldiers, I say: We give allegiance to you to follow the Book of Allah and the Sunnah [traditions] of His Messenger, to listen and obey in good and bad, to have altruism and not dispute with people in their fields except when we see clear unbelief that is proven in the revelation from Allah as much as we can . . .  Lead us on the path of martyrdom and jihad, on the steps drawn by our martyred Imam Usama [bin Laden].

Zawahari responded stating that the:

Jihadi movement is growing . . . despite the fiercest
Crusader campaign in history launched by the West against
Muslims . . . . Today, I have pleasing glad tidings for the
Muslim Ummah that will please the believers and disturb
the disbelievers, which is the joining of the Shabaab al
Mujahideen Movement in Somalia to Qaedat al Jihad, to
support the jihadi unity against the Zio[nist]- Crusader
campaign and their assistants amongst the treacherous agent
rulers who let the invading Crusader forces enter their
countries.

Since then al-Shabaab has continued to inflict unlawful violence upon innocent

civilians in the Horn of Africa. Most significantly, al-Shabaab claimed responsibility for the

September 21, 2013 attack at the Westgate shopping center in Nairobi, Kenya that killed

approximately 72 people. Among others attacks, approximately 13 people were killed in a

suicide bombing attack conducted by al-Shabaab at a Mogadishu restaurant the following month.

On or about February 21, 2014, al-Shabaab attacked the Somali presidential palace compound

and killed approximately 11, including 9 al-Shabaab fighters.

B.   The Defendants' Membership in and Provision of Material Support to al-Shabaab

The government expects to establish the following facts at trial through

witness testimony and physical and documentary evidence.

On or about August 5, 2012, the defendants were apprehended in East Africa

by local authorities after illegally crossing the border of Somalia into the neighbouring

country of Djibouti, on their way to Yemen. The foreign authorities detained the defendants

and subsequently turned them over to the United States government for prosecution in the

fall of 2012. At trial, the government intends to call witnesses at trial who have personal

knowledge of the defendants' involvement in al-Shabaab, who will testify, inter alia, about

the defendants' training and fighting on behalf of al-Shabaab against Somali government

forces.[1]  In addition, the government intends to offer evidence of recorded conversations in which defendants Ali Yassin Ahmed and Mohamed Yusuf discussed their intent to travel to Somalia and their support for violent jihad with other members of al-Shabaab located in Somalia and elsewhere.   Moreover, the government will offer into evidence an al-Shabaab propaganda video, urging people to join and fight on behalf of al-Shabaab, in which defendant Mohamed Yusuf personally appears.  The government also expects to call expert witnesses to explain al-Shabaab's recruiting methods and to provide a general history of the organization, including the group's involvement in suicide bombing attacks and other extraordinarily violent conduct – some of which was referenced above - in the context of the global jihadist movement and the defendants' actions as members of al-Shabaab.  (See ECF No. 177, Government's Expert Notice re: Matt Bryden, Evan Kohlman and Others).

B.  Potential for Interference and Threats

The nature and circumstances of this case create a heightened risk of interference with the judicial process, for both reasons specific to this case and general to cases of this type.  As noted above, the defendants have shown a potential for violence, and specifically for politically motivated violence.  Furthermore, and also as noted above, al-Shabaab has a history of violence against its perceived enemies and continues to threaten attacks, including on the United States.[2]  And, that history of violence continues until this

---

[1] Notably, the defendants' membership in al-Shabaab does not seem to be in dispute thus far in the litigation.  See e.g. ECF No. 99, Hashi Aff. ¶ 9) (affirming his provision of information to investigators  regarding "Al-Shabaab, [his] membership in and experiences with that organization . . .")

[2] See, e.g., Jeff Moore, Outside View: The al-Shabaab Westgate raid -- A forewarning, UPI, Oct. 18, 2013 http://www.upi.com/Top_News/Analysis/Outside-View/2013/10/18/Outside-View-The-al-Shabaab-Westgate-raid-A-forewarning/UPI-80641382069100/; James Miller, Al Shabaab in East Africa, Critical Threats, July 24, 2014, http://www.criticalthreats.org/somalia/miller-al-

day.  Most significantly, in September 2013, militants attacked Nairobi's main shopping

center, Westgate Mall.  The attack lasted 80 hours, involved the throwing of grenades and

firing at shoppers, and ultimately resulted in 67 deaths.[3]  Al-Shabaab publicly took credit for

the attack.[4]  Four men are facing terrorism related charges in Kenya for the Westgate attack.[5]

Even more recently, Al-Shaabab has promised to seek revenge for the death of their leader,

who was killed this past September, reportedly in a U.S. airstrike.[6]

     C.  Media Attention

        A further concern in the administration of a fair trial in this case is the

anticipated extent of media coverage and public attention to which the jurors may be

subjected.  To date, media coverage and public attention surrounding this case have been

extensive, and the government expects that the level of attention will increase once the trial

begins.  At the commencement of the case, the defendants' prosecution was publicized by the

New York Times, CBS and other major news outlets, as well as in local and international

---

shabaab-east-africa-july-24-2014; Al Shabab Claims Twin Bombings, Issues New Threat
Against U.S., NBC News, Sept. 8, 2014, http://www.nbcnews.com/news/africa/al-shabab-
claims-twin-bombings-issues-new-threat-against-u-n198246.

[3] See Terror in Nairobi: the full story behind al-Shabaab's mall attack, The Guardian, Oct. 4,
2013, http://www.theguardian.com/world/2013/oct/04/westgate-mall-attacks-kenya.

[4] See Al-Shabaab Summary, Terrorism Research and Analysis Consortium,
http://www.trackingterrorism.org/group/al-shabaab.

[5] Kenya Marks 1 Year Since Westgate Mall Attack, Fox News, Sept. 21, 2014
http://www.foxnews.com/world/2014/09/21/kenya-marks-1-year-since-westgate-mall-attack-left-
67-dead-on-high-alert-for/.

[6] Id.

news sources.[7]  The case has continued to receive media attention after the prosecution

commenced.[8]  In addition, this case also has been the focus of political activism, including

Internet social networking groups and public meetings.[9]  Furthermore, there has been much

---

[7] See, e.g., Mosi Secret, Three Men Appear in Court in Mysterious Terror Case, N.Y. Times, Dec. 21, 2012, http://www.nytimes.com/2012/12/22/nyregion/3-men-accused-of-training-with-al-shabab-appear-in-new-york-court.html?_r=0; Men Charged In New York With Training With Somali Terrorist Group, CBS New York, Dec. 22, 2012, http://newyork.cbslocal.com/2012/12/22/men-charged-in-new-york-with-training-with-somali-terrorist-group/; HARASSED… ABANDONED… STATELESS?, http://mahdihashi.net; Missing Briton 'kidnapped' by FBI and facing life in prison: Family stunned as man stripped of his UK passport appears in New York court, DailyMail.co.uk, Dec. 22, 2012, http://www.dailymail.co.uk/news/article-2252304/Mahdi-Hashi-Family-stunned-man-stripped-UK-passport-appears-New-York-court.html; Alice K. Ross, Secret Justice: Missing British-Somali man reappears in New York court, The Bureau of Investigative Journalism, Dec. 22, 2012, http://www.thebureauinvestigates.com/2012/12/22/missing-british-somali-man-reappears-in-new-york-court/.

[8] Atika Shubert, Somali family wants answers after son vanishes, reappears in U.S. custody, CNN, Mar. 27, 2013, http://www.cnn.com/2013/03/27/world/europe/us-uk-somalia-renditions/; Steve Swann, UK terror suspect Mahdi Hashi fights citizenship ruling, BBC News UK, July 25, 2013, http://www.bbc.com/news/uk-23453257; Selim Algar, Somali terror group wanted chemical weapons, N.Y. Post, Sept. 23, 2013, http://nypost.com/2013/09/23/somali-terror-group-wanted-chemical-weapons/; Meredith Clark, Terror attack causes tensions in Minnesota Somali community, MSNBC, Sept. 28, 2013, http://www.msnbc.com/melissa-harris-perry/terror-attack-causes-tensions-minnesota; Alice K. Ross, Citizenship Revoked: Stripped of his UK citizenship, now Mahdi Hashi is in solitary confinement in New York, The Bureau of Investigative Journalism, Apr. 19, 2014, http://www.thebureauinvestigates.com/2014/04/19/stripped-of-his-uk-citizenship-now-mahdi-hashi-is-in-solitary-confinement-in-new-york/.

[9] Mahdi Hashi (@StatelessMahdi), Twitter, https://twitter.com/StatelessMahdi (last updated Nov. 3, 2014); The Mahdi Hashi Campaign, Facebook.com, https://www.facebook.com/statelessmahdi; Give Mahdi Hashi his British rights back, Facebook.com (last updated Apr. 18, 2014), https://www.facebook.com/BritishMahdiHashi (last updated Nov. 5, 2014); Timeline Photos - Give Mahdi Hashi his British rights back, Facebook.com, https://www.facebook.com/BritishMahdiHashi/photos/a.405846572822057.96481.4032585364141 94/439357762804271/?type=1&relevant_count=1 (last posted on Jan. 30, 2013) (advertising public meeting to discuss Mahdi Hashi's "kidnapping"); Campaigners meeting to expose harassments by UK's MI5, Press TV, Jan. 22, 2013, http://www.presstv.ir/detail/2013/01/22/284861/campaigners-meeting-to-expose-harassments-by-uks-mi5/ (noting that "[o]ne of the main aims of the meeting was to demand the [British]

publicity surrounding defendant Mahdi Hashi's "hunger strike."[10]  Due to the widespread

public attention the defendants' case has already garnered, the government expects that the

defendants' trial will attract substantial media coverage.

## II. ANALYSIS

### A. Applicable Law

The Second Circuit has repeatedly upheld the use of anonymous juries under a

two-prong test where (1) there is strong reason to believe that the jury needs protection, and

(2) reasonable precautions have been taken to minimize any adverse effect on the jurors'

opinion of the defendant.  See Kaziu, 559 F. App'x at 37–38; United States v. Arillotta, 529

F. App'x 81, 82 (2d Cir.) cert. denied sub nom. Geas v. United States, 134 S. Ct. 666, 187 L.

Ed. 2d 440 (2013); Ibrahim, 529 F. App'x at 65; Kadir, 718 F.3d at 120–21; United States v.

Pica, 692 F.3d 79, 88 (2d Cir. 2012) cert. denied sub nom. Antico v. United States, 133 S. Ct.

1582 (2013); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v.

Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d

---

government to be held accountable for carrying out crimes against the freedoms and rights of
individuals"); Mahdi Hashi, 4theMuslims, Feb. 4, 2013, http://4themuslims.com/mahdi-hashi/
(encouraging the public to "take action" by writing to UK Home Secretary Theresa May);
HARASSED… ABANDONED… STATELESS?, http://mahdihashi.net/take-action/ (same).

[10] See, e.g., Fatima Manji, British Somali terror suspect on hunger strike in US, Channel 4 News,
Sept. 13, 2013, http://www.channel4.com/news/british-somali-terror-suspect-on-hunger-strike-
in-us; Falguni A. Sheth, This is counterterrorism?: The shocking story of Mahdi Hashi, Salon,
Sept. 25, 2013,
http://www.salon.com/2013/09/25/this_is_counterterrorism_the_shocking_story_of_mahdi_hash
i/; Jon Swaine, Briton accused of al-Shabaab chemical plot, The Telegrah, Sept. 26, 2013,
http://www.telegraph.co.uk/news/worldnews/africaandindianocean/kenya/10338183/Briton-
accused-of-al-Shabaab-chemical-plot.html; London Solidarity with California Hunger Strikers,
Stop Isolation Blog, Aug. 1, 2013, http://www.stopisolation.org/blog/london-solidarity-
california-hunger-strikers/ (noting that the mother of Mahdi Hashi spoke at a demonstration
outside the US Embassy in London "to show solidarity with the hunger strikers in California
prisons and Guantanamo Bay and political prisoners everywhere").

Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376–77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-801 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264–65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946–47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

More specifically, the Second Circuit has clarified that "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." Aulicino, 44 F.3d at 1116; see also Kadir, 718 F.3d at 120. The decision to utilize an anonymous jury "is left to the district court's discretion." Pica, 692 F.3d at 88; see United States v. Defreitas, No. 07 CR 543 (DLI), 2011 WL 317964, at *2 (E.D.N.Y. Jan. 31, 2011) aff'd sub nom. United States v. Kadir, 718 F.3d 115 (2d Cir. 2013) and aff'd sub nom. United States v. Ibrahim, 529 F. App'x 59 (2d Cir. 2013).

Courts in the Eastern District of New York have consistently empaneled anonymous juries in appropriate cases. See, e.g., United States v. Taylor, No. 10 CR 268 DLI, 2014 WL 1653194, at *18 (E.D.N.Y. Apr. 24, 2014); United States v. Herron, No. 10 CR 0615 NGG, 2014 WL 824291 (E.D.N.Y. Mar. 3, 2014); United States v. Mayes, No. 12 CR 385 ARR, 2013 WL 6175824, at *1 (E.D.N.Y. Nov. 25, 2013); Wilson, 2013 WL 1091661, at *4; United States v. Vernace, No. 11 CV 05 (SLT), 2013 WL 142373, at *1 (E.D.N.Y. Jan. 11, 2013); United States v. Lemos, No. 10 CR 954 (NGG), 2012 WL

13

6151733, at *1 (E.D.N.Y. Dec. 11, 2012); United States v. Persico, No. 10 CR 147 SLT, 2012 WL 1188243, at *1 (E.D.N.Y. Apr. 6, 2012); United States v. Prado, No. 10 CR 74 (JFB), 2011 WL 3472509, at *2 (E.D.N.Y. Aug. 5, 2011); United States v. Basciano, No. 05 CR 060 (NGG), 2011 WL 167578, at *1 (E.D.N.Y. Jan. 19, 2011); United States v. Antico, No. 08 CR 559 (S-6) (CBA), 2010 WL 2545877, at *1 (E.D.N.Y. June 11, 2010) aff'd sub nom. United States v. Pica, 692 F.3d 79 (2d Cir. 2012); United States v. Price, No. 05 CR 492 (S-3)(NGG), 2008 WL 4682408, at *1 (E.D.N.Y. Oct. 21, 2008).

      Anonymous juries have been found to be particularly appropriate in cases involving terrorism charges in both the Eastern and Southern Districts of New York. See, e.g., Kaziu, 559 F. App'x at 37–38 (court properly empaneled an anonymous jury in prosecution relating to the attempted provision of material support to the designated foreign terrorist organization al-Shabaab, which is the same group at issue here); Ibrahim, 529 F. App'x at 65 (court properly empaneled an anonymous jury in prosecution relating to plot to detonate fuel tanks at John F. Kennedy airport); Defreitas, No. 07 CR 543 (DLI), 2011 WL 317964, at *2 (same); Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917, at *2 (involving prosecution relating to plot to detonate bombs at the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania).

      In considering whether there is strong reason to believe that the jury needs protection through anonymity, the Second Circuit has generally applied three factors: (1) the seriousness of the charges against the defendants; (2) the potential threat of corruption of the judicial process; and (3) the expectation of potential publicity relating to the trial. See United States v. Young, 385 F. App'x 12, 13-14 (2d Cir. 2010); Gotti, 459 F.3d at 345–46; Aulicino, 44 F.3d at 1116; Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192-93; Vario, 943 F.2d at

14

240; <u>Tutino</u>, 883 F.2d at 1132; <u>Persico</u>, 832 F.2d at 717; <u>United States v. Ferguson</u>, 758 F.2d

843, 854 (2d Cir. 1985); <u>Barnes</u>, 604 F.2d at 141.

      In <u>United States v. Barnes</u>, the Second Circuit upheld the empaneling of an

anonymous jury and noted that "in a case that generated as much pretrial publicity as

[<u>Barnes</u>] and in which allegations of dangerous and unscrupulous conduct abounded,

precaution was best taken so that fears would not become realities."  604 F.2d at 141.  The

<u>Barnes</u> court specifically rejected any claim that the law requires jurors to disclose their

identities:

> If a juror feels that he and his family may be subjected to violence or
> death at the hands of a defendant or his friends, how can his judgment
> be as free and impartial as the Constitution requires?  If 'the
> anonymous juror feels less pressure' as a result of anonymity, . . . this
> is as it should be a factor contributing to his impartiality.

<u>Id</u>. at 140–41.

      In <u>Thomas</u>, 757 F.2d at 1364, the Second Circuit found that the protection of

jurors is vital to the function of the criminal justice system and further articulated the

importance of using jury anonymity as a mechanism to ensure a jury's fair and impartial

verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to 'take their
> chances' on what might happen to them as a result of a guilty
> verdict.  Obviously, explicit threats to jurors or their families or
> even a general fear of retaliation could well affect the jury's
> ability to render a fair and impartial verdict.  Justice requires
> that when a serious threat to juror safety reasonably is found to
> exist, precautionary measures must be taken.

<u>Id.</u> (emphasis added).

B.     An Anonymous Jury is Appropriate in this Case

As set forth above, there are three factors relevant to the determination of whether an anonymous jury is warranted: (1) the seriousness of the charges against the defendant; (2) the potential threat of corruption of the judicial process; and (3) the expectation of potential publicity. See, e.g., Young, 385 F. App'x at 13–14 ("In reviewing an anonymous jury challenge, we 'balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against [the jury's] interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'").  Here, an analysis of each of these factors warrants empaneling an anonymous jury.

1.   The Charges Are Serious

First, the defendants here face charges that are undoubtedly serious.  The underlying indictment charges the defendants with providing material support to the extremely violent foreign terrorist organization al-Shabaab, conspiracy to provide material support to al-Shabaab and use of a machinegun in furtherance of a crime of violence.  Other cases in this district in which similar charges were brought have been held to justify an anonymous jury.  See, e.g., Kaziu, 559 F. App'x at 37–38 (finding an anonymous jury proper when defendant is charged with "serious crimes of terrorism"); Kadir, 718 F.3d at 121 (2d Cir.) (finding an anonymous jury proper when there is a "reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

16

2.   The Judicial Process Is at Risk

Second, the potential threat in this case is real.  Al-Shabaab has a history of violence against its perceived enemies, including highly publicized and graphic violence. This terrorist organization presents an undeniable international threat.  As the Second Circuit has observed, "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict."  Thomas, 757 F.2d at 1364.  The possibility that al-Shabaab, the defendants, their associates, or their sympathizers, will target members of the jury in this case is a valid concern for potential members of the jury pool who may fear that disclosure of their identities or information about their families or workplaces may expose them to unnecessarily heightened risk.  See Stewart, 590 F.3d at 125 (noting "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

3.   Publicity Surrounding the Case Has Been Extensive

Given the level of media attention and public scrutiny that this case already has generated, it is reasonably foreseeable that the trial, including the jurors' identities, may be the subject of extensive media coverage and public debate, including by those who are hostile to the case.  As the Second Circuit observed in Barnes in upholding the empaneling of an anonymous jury, "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141.  As discussed above, foreign and domestic media organizations have tracked this case since the defendants appeared in U.S. criminal court in Brooklyn on December 21, 2012.  Publicity during the trial will, no doubt, intensify significantly.

17

The Second Circuit repeatedly has held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." Paccione, 949 F.2d at 1193; see Thai, 29 F.3d at 801; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717; Barnes, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press. Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment, and possible threats. The media's interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

In addition, because anonymity would be useless if jurors were permitted to interact freely with the public in the courthouse during recesses and at the beginning and end of each trial day, the jurors should be kept together during recesses, taken or provided lunch as a group, and escorted to and from the courthouse in a manner designated by the Marshals Service. Persico, 832 F.2d at 718; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990).

C. An Anonymous Jury Will Not Prejudice the Defendants

Finally, there should be no prejudice to the defendants by the imposition of an anonymous jury. The jurors may accurately be informed that their identities are being withheld due to the anticipated media interest, in order to avoid any arguable inference that the defendants themselves poses a danger to them. See Gotti, 459 F.3d at 345. Given the absence of any prejudice to the defendants, any risk of corruption to the judicial process tilts in favor of protecting the jurors through anonymity under the circumstances presented here.

Courts have expressly rejected defendants' claims that the use of an anonymous jury will create the unfair appearance that the defendant is dangerous and that, as a result, the jury will be more likely to convict him.  See, e.g., United States v. Branch, 91 F.3d 699, 725 (5th Cir. 1996) (rejecting defendants' objection to an anonymous jury based on the "speculative inference that the jurors were more likely to render a guilty verdict because of their belief that the defendants were dangerous").

Moreover, the Second Circuit has concluded that the danger that the anonymous procedure would cast unfair aspersions on the defendants is substantially minimized where the Court gives the jury a plausible reason for not disclosing their identity or taking other security measures.  See Thai, 29 F.3d at 801 (stating that "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court.  Anonymity will ward off curiosity that might infringe on juror's privacy"); Paccione, 949 F.2d at 1193 (need for anonymity explained as protection against pressures from the media); Tutino, 883 F.2d at 1133 (jury instructed that: "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual.").  Thus, in the matter at hand, the Court should issue an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media and the curious, and that selection of anonymous juries is not an unusual procedure. See, e.g., Thai, 29 F.3d at 801; Tutino, 833 F.2d at 1133; Barnes, 604 F.2d at 137; Persico, 621 F. Supp. at 879–80.

This procedure does not conflict with the defendants' right to conduct meaningful voir dire.  Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  As the Second Circuit noted in affirming the use of anonymous jury in Barnes,

> as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140.  The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez, 451 U.S. at 189; United States v. Click, 807 F.2d 847, 850 (9th Cir. 1987); United States v. Steel, 759 F.2d 706, 711 (9th Cir. 1985); Barnes, 604 F.2d at 137.  Accordingly, a full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during the voir dire process. See, e.g., Barnes, 604 at 142–43.

Where jury anonymity is warranted, the Second Circuit has thus found that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]."  Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see also Thai, 29 F.3d at 801.  Here, through the use of a questionnaire, the parties can be provided with ample information about the background and possible bias of the potential jurors.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 241–42; Tutino, 883 F.2d at 1133; United States v. Edmond, 730 F. Supp. 1144, 1149 (D.D.C. 1990) (recognizing use of juror questionnaire as efficient means of eliciting information necessary to provide meaningful voir dire while protecting jurors'

identities).  Accordingly, under the circumstances presented, empaneling an anonymous jury

is both fair and appropriate.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should order that the names,

addresses and workplaces of members of both the <u>venire</u> and <u>petit</u> juries not be revealed, that

the jurors be kept together during recesses and taken to or provided lunch as a group each

day during trial, and that they be escorted to and from the courthouse each day during trial in

a manner to be arranged by the United States Marshals Service.

Dated: Brooklyn, New York
        November 10, 2014


                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York


                        By:     _/s/_____
                                    Shreve Ariail
                                    Seth D. DuCharme
                                    Richard M. Tucker
                                    Assistant U.S. Attorneys
                                    (718) 254-6616/6021/6204




cc:      All Counsel of Record, via email and ECF