UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    - against -

ALI YASIN AHMED,
       also known as "Ismail,"
MADHI HASHI,
       also known as "Tahlha," and
MOHAMED YUSUF,
       also known as "Abu Zaid,"
       "Hudeyfa" and
       "Mohamed Abdulkadir,

       Defendants.
_____

Cr. No. 12-661(S-1) (SLT)

_____

PRE-TRIAL MOTIONS AND SUPPORTING MEMORANDUM ON BEHALF OF
DEFENDANT MOHAMED YUSUF
_____

JANE SIMKIN SMITH
P.O. Box 1277
Millbrook, New York 12545
(845) 724-3415
jssmith1@optonline.net

DAVID STERN
Rothman, Schneider, Soloway & Stern, LLP
100 Lafayette Street, Suite 501
New York, New York 10013
(212) 571-5500
dstern@rssslaw.com

ATTORNEYS FOR MOHAMED YUSUF

**TABLE OF CONTENTS**

Introduction……………………………………………………………………………………1

1.  The Indictment Must Be Dismissed………………………………………………………3

    a.  The Absence Of Any Nexus Between Defendant And The United States
       Violates Due Process……...……..……………………………………………..3

    b.  Counts One and Two Fail To Allege Essential Elements Of
       18 U.S.C. § 2339B: (1) That The Offense Occurred In Whole Or In Part
       Within The United States; and (2) That The Offense Occurred In Or
       Affected Interstate Or Foreign Commerce...…………………………………7

        i.  A Statute Should Be Construed So That No Part Will Be
          Inoperative Or Superfluous……………………………………………12

        ii.  Constitutionally Doubtful Constructions Should Be Avoided…………..14

        iii.  There Is A "Presumption That United States Law Governs
          Domestically But Does Not Rule The World."

          Statutes Should Be Construed So As To Comport With
          International Law.

          The Presumption Against Extraterritoriality Is Not Defeated Even
          When Congress Specifically Addresses An Issue of
          Extraterritorial Application…......……………………………………23

        iv.  Ambiguity In A Statute Should Be Resolved In Favor Of Lenity….……29

    c.  The Invalidity Of Counts 1 and 2 Also Undermines The Firearm Count………..32

    d.  If §§ 2339B(d)(1)(D) And (E) Are Not Elements, 18 U.S.C. § 2339B
       Is Unconstitutional……………………………………………………………32

    e.  All Counts Must Be Dismissed Because The Underlying Statute,
       18 U.S.C. § 2339B, Is Unconstitutionally Vague………………………………33

    f.  Count 3 Should Be Dismissed: 18 U.S.C. §§ 924(c) Does Not
       Have Extraterritorial Application, And If It Does, Its Application
       To Defendant Violates Due Process…………………………………………..38

g.   The Indictment Does Not Fairly Inform Defendant Of The Charges …………...39

i.   There is insufficient precision with respect to the *mens rea* element
in Counts 1 and 2. ……………………………………………………40

ii.   The time span alleged in each substantive count is vast ("[i]n or
about and between December 2008 and August 2012"),
the place indeterminate ("within the extraterritorial jurisdiction
of the United States"), and the conduct imprecise; in addition,
Count 1, the conspiracy count, is defective because it fails to
charge an overt act, and Count 3, the firearms count, is defective
because it is duplicitous……………………………………………………41

h.   The Indictment Was Not Filed Within The Time Limits Of
18 U.S.C.   § 3161(b)……………………………………………………..43

2.   The Government Should Be Ordered To Provide Particulars…………………………...44

3.   Motion *In Limine* For An Order Directing Government Witnesses Not Use To Use
The Statutory Words And Phrases "Terrorist," "Terrorist Activity" Or "Terrorism."….47

4.   Motion For Notice Pursuant To Fed. R. Evid. 404(b)(2)………………………………...49

5.   Motion To Suppress Statements And Fruits Of Statements And Motions
Related Thereto………………………………………………………………………..51

6.   Defendant Yusuf Joins In The Pre-Trial Motions And Supporting Memoranda
Of His Co-Defendants…………………………………………………………………51

Conclusion………………………………………………………………………...52

# TABLE OF AUTHORITIES

## Cases

*American Civil Liberties Union v. Clapper*, 959 F. Supp. 2d 724 (SDNY 2013) (while ............ 21

*Apprendi v. New Jersey*, 530 U.S. 46 (2000) ................................................................. 21

*Arbaugh v. Y. H. Corp.,* 546 U.S. 500 (2006) .................................................................. 8

*Arnett v. Kennedy,* 416 U.S. 134 (1974) ........................................................................ 14

*Cook v. United States*, 288 U.S. 102 (1933) .................................................................. 26

*Corley v. United States*, 556 U.S. 303 (2009) ................................................................ 12

*EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244 (1991) ...................................................... 23

*F. Hoffmann-LaRoche Ltd. v. Empagran, S.A.,* 542 U.S 155 (2004) ............................. 25, 26, 28

*FAA v. Landy*, 705 F.2d 624 (2d Cir.), *cert. denied*, 464 U.S. 895 (1983) .................................. 48

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947) ................................................. 36

*Gomez* v. *United States*, 490 U. S. 858 (1989) .............................................................. 23

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ......................................................... 33

*Hamling v. United States*, 418 U.S. 87 (1974) ................................................................. 7

*Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993) ...................................... 26

*Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197 (2011) .................................... 9

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ................................................ 34

*Hygh v. Jacobs,* 961 F.2d 359 (2d Cir. 1992) ................................................................. 48

*In re Winship*, 397 U.S. 358 (1970) ............................................................................... 21

*Jones v. United States*, 526 U.S. 227 (1999) .................................................................... 7

*Jones v. United States,* 529 U.S. 848 (2000) .................................................................. 14

*Kelly v. Wauconda Park Dist.,* 801 F.2d 269 (7th Cir. 1986) .......................................... 13

*Lanzetta v. New Jersey,* 306 U.S. 451 (1939) ................................................................. 33

*Loginovskaya v. Batratchenko,* 764 F.3d 266 (2d Cir. 2014) ......................................... 25

*Lotes Co. Ltd. v. Hon Hai Precision Industry Co., Ltd.*, 753 F.3d 395 (2d Cir. 2014) .................. 9

iii

*Loving* v. *United States*, 517 U. S. 748 (1996) ........................................................... 23

*Mastafa v. Chevron,* __F.3d. __, 2014 U.S. App. LEXIS 20559 (2d Cir. October 23, 2014) ........ 5

*McCullough v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ........................................... 15

*Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437 (2007) ................................................ 25

*Mizrahi v. Gonzales*, 492 F.3d 156 (2d Cir. 2007) ..................................................... 13

*Morrison v. National Australia Bank Ltd.,* 561 U.S. 247 (2010) ......................... passim

*Moskal* v. *United States*, 498 U. S. 103 (1990) ........................................................... 31

*Mullaney v. Wilbur*, 421 U.S. 684 (1975) ................................................................... 21

*Murray* v. *The Charming Betsy*, 6 U.S. 64 (1804), ............................................... 23, 26

*Patterson v. New York*, 432 U.S. 197 (1977) ............................................................... 21

*Perez v. Brownell*, 356 U.S. 44 (1958) ........................................................................ 20

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .......................................................... 13

*Rewis v. United States*, 401 U.S. 808 (1971) .............................................................. 32

*Reynolds v. United States,* 132 S.Ct. 975 (2012) ........................................................ 22

*Russell v. United States,* 369 U.S. 749 (1962) .................................................... 7, 39, 41

*Skilling* v. *United States*, 561 U. S. 358 (2010) .......................................................... 31

*Smith* v. *United States*, 507 U.S. 197 (1993) .............................................................. 25

*Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83 (1998) ................................. 8

*Toler v. McGinnis,* 23 Fed. Appx 259 (6th Cir. 2001) ............................................... 21

*United States v. Afshari*, 426 F.3d 1150 (9th Cir. 2005) ........................................... 50

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ..................................... 3, 4, 18

*United States v. Aleynikov,* 676 F.3d 71  (2d Cir. 2010) ............................................... 7

*United States v. Aleynikov,* 676 F.3d 71 (2d Cir. 2012) ............................... 7, 12, 13, 31

*United States v. Aleynikov*, 737 F. Supp. 2d 173 (SDNY 2010) ................................... 7

*United States v. Alfonso,* 143 F.3d 772 (2d Cir. 1998) ............................................... 39

*United States v. Alvarez-Machain*, 504 U.S. 655 (1992) ........................................................ 10

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005) ........................................................ 13

*United States v. Bahlul,* 2014 U.S. App. LEXIS 13287, (D.C. Cir. July 14, 2014) .................... 18

*United States v. Barone,* 71 F. 3d 1442 (9th Cir. 1994) ........................................................ 21

*United States* v. *Bass*, 404 U. S. 33 (1971) ........................................................................ 31

*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) ........................................................ 38

*United States v. Bin Ladn*, 92 F. Supp. 2d 189 (SDNY 2000) ............................................... 26

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ..................................................... 44

*United States v. Bowman,* 260 U.S. 94 (1922) ..................................................................... 38

*United States v. Brenner*, 287 F. 636 (2d Cir. 1922) .............................................................. 7

*United States v. Cardales-Luna,* 632 F.3d 731 (1st Cir. 2011) ................................................ 24

*United States v. Cruikshank,* 92 U.S. 542, 558, 23 L. Ed. 588 (1876) ....................................... 40

*United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936) .......................................... 19

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ....................................................... 45

*United States v. Davis,* 905 F.2d 245 (9th Cir. 1990) ...................................................... 3, 4, 18

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir.) (mem.), cert. denied, 493 U.S. 834 (1989) .................................................................................. 44

*United States v. Gaudin*, 515 U.S. 506 (1995) ..................................................................... 21

*United States* v. *Granderson*, 511 U. S. 39 (1994) ............................................................... 31

*United States v. Hammoud*, 381 F. 3d 316 (4th Cir. 2004) ..................................................... 50

*United States v. Jackson*, 513 Fed. Appx. 51 (2d Cir.) (Summary Order), *cert denied,* 133 S.Ct. 1848 (2013) ................................................................................................................ 43

*United States v. Jenkins*, 909 F. Supp. 2d 758 (E.D. Ky. 2012) ............................................... 19

*United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998) ......................................... 21

*United States v. Kwan*, 607 F.3d 306 (2d Cir. 2010) ............................................................. 13

*United States v. Lindsay*, 985 F.2d 666 (2d Cir.), *cert. denied*, 510 U.S. 832 (1993) .................. 43

*United States v. Lopez*, 514 U.S. 549 (1995) ............................................................ 11, 14, 19, 33

*United States v. Margiotta,* 646 F.2d 723 (2d Cir. 1981) ............................................ 42

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................................ 15

*United States v. Mostafa,* (SDNY, Docket No. 04cr356) ............................................ 41

*United States v. Murray,* 618 F.2d 892 (2d Cir. 1980) ................................................ 43

*United States v. Naseer,* 2014 U.S. Dist. LEXIS 108933, (EDNY 2014) .................... 37

*United States v. Nippon Paper Industries Co., Ltd.*, 190 F. 3d 1 (1st Cir. 1997) .......... 27

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) ................................................ 45

*United States v. Pinto-Mejia*, 720 F.2d 248 (2d Cir. 1983) ........................................ 29

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ...................................................... 7

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ...................................................... 7

*United States v. Reiter*, 897 F.2d 639 (2d Cir. 1990) .................................................. 14

*United States v. Sabella*, 272 F.2d 206 (2d Cir. 1959) ................................................ 8

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) .................................................... 48

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) .............................................. 38

*United States v. Staples,* 85 F.3d 461 (9th Cir. 1996) ................................................ 33

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ...................................... 40

*United States v. Taleb-Jedi*, 566 F. Supp. 2d 157 (EDNY 2008) ................................ 50

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ................................................ 44

*United States v. Tramunti,* 513 F.2d 1087 (2d Cir. 1975) .......................................... 40

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218 (1952) .......................... 32

*United States v. Vilar,* 729 F.3d 62 (2d Cir. 2013) .......................................... 4, 24, 38

*United States v. Williams,* 553 U.S. 285 (2008) ........................................................ 22

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) .................................................. 44

*United States v. Yousef,* 327 F.3d 56 (2d Cir.), *cert. denied*, 540 U.S. 933 (2003) .............. passim

*United States v. Yousef*, 750 F.3d 254 (2d Cir. 2014)............................................................. passim

*Weinberger* v. *Rossi*, 456 U.S. 25 (1982) ...................................................................... 23

*Weiss v. National Westminster Bank PLC*, Docket No. 13-1618-cv, 2014 U.S. App. LEXIS 18061 (2d Cir. September 22, 2014).......................................................................... 35

*Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457 (2001) .............................................. 23

## Statutes

10 U.S.C. § 950t (24) ............................................................................................. 6

10 U.S.C. § 950t (25) ............................................................................................. 6

11 U.S.C. § 101 .................................................................................................... 6

14 U.S.C. § 713 .................................................................................................... 6

18 U.S.C. § 1001 .................................................................................................. 6

18 U.S.C. § 1425 .................................................................................................. 6

18 U.S.C. § 1427 .................................................................................................. 6

18 U.S.C. § 1505 .................................................................................................. 6

18 U.S.C. § 1541 .................................................................................................. 6

18 U.S.C. § 1542 .................................................................................................. 6

18 U.S.C. § 1543 .................................................................................................. 6

18 U.S.C. § 1544 .................................................................................................. 6

18 U.S.C. § 1546 .................................................................................................. 6

18 U.S.C. § 1547 .................................................................................................. 6

18 U.S.C. § 2 ...................................................................................................... 42

18 U.S.C. § 226 ................................................................................................... 6

18 U.S.C. § 2331(1) .............................................................................................. 5

18 U.S.C. § 2331(5) .............................................................................................. 5, 6

18 U.S.C. § 2332b(g)(5) ......................................................................................... 6

18 U.S.C. § 2339B(d)(1) .................................................................................. 10

18 U.S.C. § 2339B(d)(1)(D) ............................................................................. 8

18 U.S.C. § 2339B(d)(1)(E) ............................................................................. 8

18 U.S.C. § 3077 ............................................................................................... 6

18 U.S.C. § 3161(b) ......................................................................................... 44

18 U.S.C. § 3161(h) ......................................................................................... 44

18 U.S.C. § 3162(a)(1) ..................................................................................... 44

18 U.S.C. § 32(b)(3) ........................................................................................ 17

18 U.S.C. § 844(i) ............................................................................................ 14

18 U.S.C. § 922(q)(1)(A) ................................................................................. 11

18 U.S.C. § 924(c)(1) ....................................................................................... 33

18 U.S.C. § 981 ................................................................................................. 6

18 U.S.C.§ 1426 ................................................................................................ 6

18 USC Appx §§ 2L1.2, 2X1.1, 2X3.1, 3A1.4 ................................................ 6

20 U.S.C. § 6736 ............................................................................................... 6

22 U.S.C. § 8513 ............................................................................................... 6

26 U.S.C. § 6103 ............................................................................................... 6

28 U.S.C. § 530C .............................................................................................. 6

42 U.S.C. § 14503 ............................................................................................. 6

46 U.S.C. § 70122 ............................................................................................. 6

46 USC § 70105 ................................................................................................ 6

49 U.S.C. § 44941 ............................................................................................. 6

50 U.S.C. § 1701 ............................................................................................... 5

6 U.S.C. § 101 ................................................................................................... 5

6 U.S.C. § 1104 ................................................................................................. 6

6 U.S.C. § 444 ................................................................................................ 6

7 U.S.C. § 8401 ............................................................................................. 6

8 U.S.C. § 1182(a)(3)(B) ..................................................................... 5, 34, 35

8 U.S.C. § 1182(a)(3)(B)(ii) ........................................................................ 35

8 U.S.C. § 1182(a)(3)(B)(iii) .......................................................................... 5

8 U.S.C. § 1182(a)(3)(B)(V)((b) ................................................................. 37

8 U.S.C. § 1189 ........................................................................................... 19

8 U.S.C. § 1189(a)(1)(C) .............................................................................. 20

8 U.S.C. § 1189(a)(8) ................................................................................... 49

8 U.S.C. § 1189(d)(2) ................................................................................... 20

Pub. L. 104-132 ........................................................................................... 15

**Rules**

Fed. R. Crim P. 12(b)(3)(B) ........................................................................... 7

Fed. R. Crim. P. 43 ...................................................................................... 14

Fed. R. Crim. P. 6(3)(E)(ii) .......................................................................... 51

Fed. R. Crim. P. 7(c) .............................................................................. 7, 39

Fed. R. Crim. P. 7(f) .................................................................................... 44

Fed. R. Evid. 102, 401, 403, 702, 703 and 704 ............................................. 47

Fed. R. Evid. 401 ......................................................................................... 50

Fed. R. Evid. 403 ......................................................................................... 50

Fed. R. Evid. 404(b)(2) ........................................................................... ii, 49

**Treaties**

Convention on the Prevention and Punishment of Crimes Against Internationally Protected
   Persons, including Diplomatic Agents, 14 December 1973, 28 1035 U.N.T.S. 167 ............... 36

Hague Convention for the Suppression of Unlawful Seizure of Aircrafts, 16 December 1970, 860
   U.N.T.S. 105 ......................................................................................................................... 36

International Convention Against the Taking of Hostages, 17 December 1979, 1316 U.N.T.S.
   205 ........................................................................................................................................ 36

International Convention for the Suppression of Terrorist Bombings, GA res. 52/164, 15
   December 1997 (1998), 37 ILM 249 ..................................................................................... 36

Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation,
   23 September 1971, 974 U.N.T.S. 177 .................................................................................. 36

Montreal Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving Civil
   Aviation, 24 February 24 1988, 27 I.L.M. 627 ...................................................................... 36

Tokyo Convention on Offences and Certain Other Acts Committed on Board Aircraft, 14
   September 1963, 704 U.N.T.S. 219 ....................................................................................... 36

**Other Authorities**

Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and Intersection of
   National and International Law,* 48 Harvard International Law Journal 121 ............................ 5

Colangelo, *What is Extraterritorial Jurisdiction?*, 99 Cornell L. Rev. 101 (2014) ..................... 9

Kapitan & Schulte*, "*The rhetoric of `terrorism' and its consequences" (2002) 30:1 Journal of
   Political and Military Sociology 172 ..................................................................................... 47

Kapitan, "*The Reign of `Terror,'"* N.Y. Times, October 19, 2014,
   http://opinionator.blogs.nytimes.com/2014/10/19/the-reign-of-terror/?emc=eta1 .................. 47

Keenan & Shroff, *Taking the Presumption Against Extraterritoriality Seriously in Criminal
   Cases after Morrison and Kiobel,* 45 Loyola University Chicago Law Journal 71 (2013) ...... 39

Restatement (Third) of Foreign Relations Law of the United States (1986) .......................... 26, 27

United Nations, *Multilateral Treaties Deposited with the Secretary-General: Status as at 31
   December 2005*, 165, 166, 169 (2002) .................................................................................. 28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    - against -

ALI YASIN AHMED,
    also known as "Ismail,"
MADHI HASHI,
    also known as "Tahlha," and
MOHAMED YUSUF,
    also known as "Abu Zaid,"
    "Hudeyfa" and
    "Mohamed Abdulkadir,

    Defendants.

Cr. No. 12-661(S-1) (SLT)

_____

**PRE-TRIAL MOTIONS AND SUPPORTING MEMORANDUM ON BEHALF OF
DEFENDANT MOHAMED YUSUF**

_____

**Introduction**

Defendant, a person of foreign birth and citizenship, is being prosecuted for conduct he allegedly committed entirely outside of the United States and with no alleged nexus to the United States. This memorandum is submitted in support of an eight-pronged motion to dismiss the indictment, and four other forms of relief.

We move to dismiss the indictment on the grounds that: (1) the application of the criminal laws of the United States to defendant is fundamentally unfair and violates the Fifth Amendment; (2) Counts One and Two of the indictment fail to state two elements of 18 U.S.C. § 2339B that are essential for extraterritorial application (namely, that the offense occurred in part within the United States, and the offense occurred in or affected interstate or foreign

commerce); and this defect undermines the validity of the firearm count.  Alternatively, if conduct in the United States and in or affecting interstate or foreign commerce are not elements, then §2339B is unconstitutional in that (a) §2339B is not tied to an enumerated power of Congress; (b) the statute is vague and standardless, allowing for discriminatory enforcement and violates the principle that legislative powers are non-delegable; and (c) the statute violates the due process notice/opportunity-to-be-heard rights of those charged.

Other constitutional and statutory grounds for dismissing the indictment are: 18 U.S.C. § 2339B is unconstitutionally vague for reasons apart from issues relating to its extraterritorial application; 18 U.S.C. § 924(c) does not have extraterritorial application, and application of the statute to defendant violates due process for lack of notice; and the indictment does not fairly inform the defendant of the charges against him because (a) there is insufficient precision with the respect to the *mens rea* element of the "material support" charges, (b) the time span alleged in each count is vast, the place indeterminate; (c) with respect to the conspiracy count, no overt act is charged; and (d) the firearm count is duplicitous.  Moreover, the length of time between defendant's arrest and the return of the indictment violates the Speedy Trial Act.

Defendant also moves for orders (1) directing the government to provide particulars; (2) precluding government witnesses from using the statutory words and phrases "terrorist", "terrorist activity" and "terrorism"; (3) directing the prosecutors to provide notice of any and all uncharged "bad acts" allegedly committed either by defendant or others that they intend to proffer at trial; and (4) granting the defendants' previously filed motions to suppress and thereby precluding the government from introducing into evidence (either in its direct case or in cross-examination of the defendant should he choose to testify) all statements and the tainted fruits of those statements.  Defendant joins in the pretrial motions of his co-defendants.

1.  **The Indictment Must Be Dismissed**

    a.  **The Absence Of Any Nexus Between Defendant And The United States Violates Due Process**

Defendant, a Somali by birth and a citizen of Sweden, is being prosecuted for conduct he allegedly committed entirely outside of the United States and with no alleged nexus to the United States. The application of the criminal laws of the United States to him is fundamentally unfair and violates the Fifth Amendment.

In order for a federal criminal statute to apply extraterritorially to a defendant *"consistently with due process*, there must be a sufficient nexus *between the defendant and the United States*, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef,* 327 F.3d 56, 111 (2d Cir.), *cert. denied*, 540 U.S. 933 (2003) (quoting *United States v. Davis,* 905 F.2d 245, 248-49 (9th Cir. 1990); emphasis added).  *Accord, United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *United States v. Yousef*, 750 F.3d 254, 258 (2d Cir. 2014).

The indictment in this case does not allege any nexus between defendant (or his alleged conduct) and the United States.  Unlike, for example, *United States v. Yousef,* 327 F.3d 56, (where the defendant, acting outside the United States, was one of the chief architects of a plot to blow up a dozen U.S. aircraft for the purpose of inflicting harm on the United States and influencing U.S. foreign policy), or *Al Kassar* (where the "defendants' conspiracy was to sell arms to FARC with the understanding that they would be used to kill Americans and destroy U.S. property; the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States"), 660 F.3d at 118, or *Davis* (where the defendant, arrested on the high seas, was attempting to smuggle drugs into the United States), here, Mr. Yusuf is not alleged to have had any focus on, aims directed at, or contacts with the United States during the extended period

charged in the indictment (2008-2012).  Not only is the indictment silent as to a U.S. nexus, but also, nothing that the government has provided to date shows that the defendant had any notice or reason to believe that he was subjecting himself to U.S. law and could be haled into a U.S. court for his conduct.  Without such notice or nexus to the U.S., the prosecution is arbitrary and unfair, and the entire indictment must be dismissed.  See *Yousef,* 750 F.3d at 262, recognizing that the absence of nexus is a ground for dismissing the indictment:

> A court's power to hear a case does not, of course, conclusively establish the government's authority to prosecute it. Our jurisprudence is replete with limitations on the exercise of that authority, whether by virtue of constitutional provisions, like the Due Process Clause, or judicially created doctrines, like the presumption against extraterritoriality. *See United States v. Vilar*, 729 F.3d 62, 72-74 (2d Cir. 2013). The due process requirement that a territorial nexus underlie the extraterritorial application of a criminal statute is just such a limitation. It protects criminal defendants from prosecutions that are `arbitrary or fundamentally unfair.' *See Al Kassar*, 660 F.3d at 118 (quoting *Yousef*, 327 F.3d at 111) (internal quotation marks omitted). *The absence of the required nexus… may have been grounds for dismissing the indictment before the district court ….*[1] (Emphasis added.)

The Ninth Circuit, in *United States v. Davis,* opined that, while not determinative, international law provides "a rough guide" as to whether a sufficient nexus exists between a person and the United States to satisfy due process.  Where there is universal condemnation of the conduct engaged in by a defendant (such as aircraft bombing or hijacking), the defendant

---

[1] In *Yousef,* the defendant – who pled guilty to one count of conspiring to provide material support to a foreign terrorist organization –allegedly orchestrated an arms deal with a Colombian terrorist organization from a prison cell in Honduras.  He moved to dismiss the indictment in the district court on the ground it failed to allege a sufficient nexus between him and the United States. Yousef argued that the due process requirement of a territorial nexus was a "non-waivable jurisdictional question" that could be raised on appeal despite the guilty plea.  The Circuit rejected this argument, holding that, in the waiver context, "jurisdiction" refers to the subject-matter jurisdiction of the court to entertain the prosecution; the Court concluded that the district court had subject-matter jurisdiction by virtue of 18 U.S.C. § 3231, and that Yousef's nexus challenge did not raise a question of the district court's jurisdiction to hear the case.

would be hard pressed to argue that being haled into a U.S. court to face charges for that conduct is arbitrary or unfair.

However, here, by contrast, there is no universal definition of "terrorism" or "terrorist activity"; nor is there unqualified condemnation of the conduct alleged in this indictment.  See generally, Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and Intersection of National and International Law,* 48 Harvard International Law Journal 121, 181-188.  *See also, Mastafa v. Chevron,* __F.3d. __, 2014 U.S. App. LEXIS 20559, *18 (2d Cir. October 23, 2014) (even murder, which is universally proscribed by the domestic law of all countries (subject to varying definitions) is not actionable under the Alien Tort Statute as a violation of "customary international law" because the nations of the world have not demonstrated that this wrong is of mutual, and not merely several, concern).

Indeed, there are not even settled definitions of the terms "terrorist activity" or "terrorism" in the U.S. Code.  Compare, for example, the expansive definition of the term "terrorist activity" in 8 U.S.C. § 1182(a)(3)(B)(iii) (which includes unlawful use of any "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property") with the definitions of the following terms: (*1*) "terrorism" in 6 U.S.C. § 101, "international terrorism" in 50 U.S.C. § 1701, and both "international" and "domestic" "terrorism" in 18 U.S.C. §§ 2331(1) and (5) (as requiring, *inter alia,* that the activities "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct

of a government by mass destruction, assassination, or kidnapping")[2]; (*2*) the term "act of terrorism" in 6 U.SC. § 444 (requiring harm to a person, property or entity in the United States or to a domestic air carrier or United States-flag vessel, and use of "methods designed or intended to cause mass destruction, injury, or other loss to citizens or institution of the United States"); (*3*) the term "Federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5) (which "means an offense that – (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; *and* (B) is a violation of" a long list of federal statutes)[3]; and (*4*) the offenses labeled "Terrorism" and "Providing material support for terrorism" set forth in 10 U.S.C. §§ 950t (24) and (25) (which require, respectively, that the violent conduct be committed "in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion or to retaliate against government conduct" and knowledge that the material support or resources "are to be used in preparation for, or in carrying out, an act of terrorism" or "to an international terrorist organization engaged in hostilities against the United States.")

Given this lack of consensus, and the lack of any allegation in this indictment of a connection between the defendant or his conduct and the United States, application of the federal criminal statutes here is fundamentally unfair. The indictment should be dismissed in its entirety.

---

[2] The definition of terrorism in 6 U.S.C. § 101 is used in 14 U.S.C. § 713; the definition of "international terrorism" in 50 U.S.C. § 1701 is used in 22 U.S.C. § 8513. The definitions of terrorism in 18 U.S.C. § 2331 are used in numerous statutes explicitly and by reference including 18 U.S.C. §§ 226, 1001, 1425, 1426, 1427, 1505, 1541, 1542, 1543, 1544, 1546, 1547, 3077, 11 U.S.C. § 101, 20 U.S.C. § 6736, 46 U.S.C. § 70122, 49 U.S.C. § 44941, 6 U.S.C. § 1104, 7 U.S.C. § 8401, 26 U.S.C. § 6103, 28 U.S.C. § 530C, 42 U.S.C. § 14503.

[3] The definition of "Federal crime of terrorism" set forth in § 2332b(g)(5) is used in 18 U.S.C. § 981, the Federal Guideline, 18 USC Appx §§ 2L1.2, 2X1.1, 2X3.1, 3A1.4, as well as in 46 USC § 70105.

**b. Counts One and Two Fail To Allege Essential Elements Of 18 U.S.C. § 2339B: (1) That The Offense Occurred In Whole Or In Part Within The United States; and (2) That The Offense Occurred In Or Affected Interstate Or Foreign Commerce.**

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him. *See Jones v. United States*, 526 U.S. 227, 232, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999); *Hamling v. United States*, 418 U.S. 87, 117, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974) (`An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'); Fed. R. Crim. P. 7(c). An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments. *See Russell v. United States*, 369 U.S. 749, 760-61, 8 L. Ed. 2d 240, 82 S. Ct. 1038 (1962)." *United States v. Pirro*, 212 F.3d 86, 91-92 (2d Cir. 2000).

An indictment that fails to state the elements of an offense, and fails to allege the essential facts constituting the offense, is "legally insufficient." *United States v. Aleynikov,* 676 F.3d 71, 76  (2d Cir. 2010).  It should be dismissed pursuant to Fed. R. Crim P. 12(b)(3)(B). *United States v. Aleynikov*, 737 F. Supp. 2d 173 (SDNY 2010).  See also *United States v. Brenner*, 287 F. 636, 639 (2d Cir. 1922) ("It is a general rule in reference to an indictment that all material facts and circumstances embraced in the definition of the offense must be stated, and that, if any essential element of the crime is omitted, such omission cannot be supplied by intendment or implication.")

For the many reasons discussed below, 18 U.S.C. § 2339B must be construed to require as essential elements of both the substantive and conspiracy offense that "the offense occurs in whole or in part within the United States" and "the offense occurs in or affects interstate or

foreign commerce."   18 U.S.C. § 2339B(d)(1)(D) and (E).    These provisions, set forth in subsection (d), a subsection entitled "Extraterritorial Jurisdiction", follow the preamble in subdivision (d)(1): "In general.  There is jurisdiction over an offense under subsection (a) if - ". As explained below, numerous rules of construction dictate that both (D) and (E) set forth limitations on the exercise of extraterritorial jurisdiction and are threshold requirements of material support claims involving foreign conduct.  Failure to charge them offends the Fifth and Sixth Amendments and is fatal to this indictment.   This, we believe, is an issue of first impression.

<u>Interpreting § 2339B(d) Requires Appreciating That The Term "Jurisdiction" Is Polymorphic</u>

"Jurisdiction" has several different meanings and may take different forms depending on the context in which it is to be applied. See *Arbaugh v. Y. H. Corp.,* 546 U.S. 500, 509 (2006) ("'Jurisdiction,' this Court has observed, "is a word of many, too many, meanings." *Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83, 90, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (internal quotation marks omitted). This Court, no less than other courts, has sometimes been profligate in its use of the term."); see also *United States v. Yousef,* 750 F.3d 254, 259 (2d Cir. 2014) ("'the legal lexicon knows no word more chameleon like than "jurisdiction."'") (quoting, *United States v. Sabella*, 272 F.2d 206, 209 (2d Cir. 1959)).

There are three main types of jurisdiction:  (1) prescriptive (that is, the legislature's authority to make and to apply its laws to certain persons or things); (2) adjudicative (i.e., the authority of a court to adjudicate legal questions ["subject-matter jurisdiction"] and to subject persons or things to the judicial process ["personal-jurisdiction"]); and (3) enforcement

(generally, the exercise of executive power to enforce the law). [4] *See generally,* Colangelo, *What is Extraterritorial Jurisdiction?*, 99 Cornell L. Rev. 101, 107-108 (2014). *See also Adventure Communications, Inc. v. Kentucky Registry of Election Finance,* 24 F. Supp. 2d 632, 638-9 (S.D. W. Va. 1998) (Court discusses distinction between adjudicatory jurisdiction and legislative authority in the context of a state's attempt to criminalize purely extraterritorial activity).

Inelegantly, different types of "jurisdiction" (which are often confused, see *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 254 (2010)) are lumped together in the six subsections of § 2339B(d)(1) that follow the preamble "There is jurisdiction over an offense under subsection (a) if −": four subsections of §2339B(d)(1) entail the reach of U.S. laws based on the "offender"; two entail the reach of U.S. laws based on the "offense".  See *Lotes Co. Ltd. v. Hon Hai Precision Industry Co., Ltd.*, 753 F.3d 395, 407 (2d Cir. 2014) ("Given that the judiciary often conflated these concepts until the Supreme Court began in recent years `to bring some discipline to the use of this term,' *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202, 179 L. Ed. 2d 159 (2011), Congress's loose language is hardly surprising.")

---

[4] Addressing whether a federal statute applies to overseas conduct, the Second Circuit has previously framed the issue as one of "subject matter jurisdiction." *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 85, n. 16 (2d Cir. 2003) ("By `extraterritorial jurisdiction' we mean subject matter jurisdiction of a United States court to adjudicate conduct committed outside of the United States."). In *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 253-4 (2010), the Court clarified that determining the meaning of a statute and its exterritorial reach is a matter of prescriptive not adjudicative jurisdiction: "Before addressing the question presented, we must correct a threshold error in the Second Circuit's analysis. It considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the District Court's dismissal under Rule 12(b)(1). … But to ask what conduct §10(b) reaches is to ask what conduct §10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, `refers to a tribunal's  "power to hear a case."' It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief.  The District Court here had jurisdiction under 15 U.S.C. § 78aa to adjudicate the question whether § 10(b) applies to National's conduct.") (Citations and footnote omitted.) Recently, in a case coincidentally also entitled *United States v. Yousef,* 750 F.3d 254, 262 (2d Cir. 2014), the Circuit acknowledged, "Under *Morrison*, whether [a statute] is intended to reach overseas conduct … is a merits question that does not implicate the power of the district court to hear and decide the case."

Thus, the first three and the last subsection of § 2339B(d)(1) – §§ (A), (B), (C), and (F) --

assert "jurisdiction" based on the offender:

> There is jurisdiction over an offense under subsection (a) if –
>
> (A) an offender is a national of the United States… or an alien lawfully admitted for permanent residence in the United States…;
>
> (B) an offender is a stateless person whose habitual residence is in the United States;
>
> (C) *after the conduct required for the offense occurs* an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;
>
> * * *
>
> (F) an offender aids or abets *any person over whom jurisdiction exists* under this paragraph in committing an offense under subsection (a) or conspires with *any person over whom jurisdiction* exits under this paragraph to commit an offense under subsection (a).
>
> (Emphasis added.)

In each of these circumstances, "jurisdiction" (and the potential reach of the statute to

prosecute individuals who have acted abroad) is premised on the status, position or condition of

the offender and his relation to the United States, not on the conduct he or she committed or the

place where he or she committed any offense conduct.  These four provisions, as a group, allow

for "jurisdiction" over both nationals and foreigners without reference to whether the person has

acted inside or outside the United States. (Indeed, subsection (C) explicitly refers to the

whereabouts of the offender "**after**" the commission of the offense.)  This kind of provision is

normally associated with *adjudicative* jurisdiction; it relates to the power of the court to subject a

person to judicial process. See *United States v. Alvarez-Machain*, 504 U.S. 655, 657, 670 (1992)

(a criminal defendant, forcibly abducted to the United States from a nation with which it has an

extradition treaty does not thereby acquire a defense to the jurisdiction of this country's courts; he may be tried in the district court for violations of the criminal laws of the United States).

By contrast, the fourth and fifth subsections of § 2339B(d)(1) concern the offense itself. These subsections provide "jurisdiction over an offense under subsection (a) if":

> (D) the offense occurs in whole or in part within the United States;

> (E) the offense occurs in or affects interstate or foreign commerce…

Subsections (D) and (E) fall within the *prescriptive jurisdiction* arena: they relate to and define the conduct being regulated. Moreover, subsection (E) also serves to identify the interstate and foreign commerce clause of Article I (§8, cl. 3) as the source of Congress's authority to regulate the activities prohibited in §2339B(a). *Cf. United States v. Lopez*, 514 U.S. 549, 561 (1995) (holding that the Gun-Free School Zones Act of 1990 (18 U.S.C. § 922(q)(1)(A)), prohibiting possession of firearm in school zone, exceeded Congress's authority to regulate commerce under the commerce clause, Court emphasized that "Section 922(q) is a criminal statute that by its terms has nothing to do with  `commerce' or any sort of economic enterprise, however broadly one might define those terms," and "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.")

Numerous rules of statutory construction (discussed below) dictate that, notwithstanding the presence of the word "or" separating subdivisions (E) and (F) of §2339B(d)(1), the two prescriptive provisions – (D) and (E) - identify essential elements of the offense. To read the subdivisions of §2339B(d)(1) in the disjunctive (as providing alternative bases for the exercise of the court's personal and/or subject-matter jurisdiction) not only would render these key provisions superfluous, but, more importantly, without subdivisions (D) and (E), the statute

would both be unconstitutional (as beyond Congress's enumerated powers and a violation of due process) and contravene the Law of Nations.[5]

Though both subsections (D) and (E) allow for the possibility that the law may extend to conduct committed (by both nationals and foreigners) abroad ("extraterritorially"), both subsections actually require a connection to the "territoriality" of the United States, and, therefore, ought to be read as *limits* on the extraterritorial reach of the statute:  the crime must occur at least in part in the United States under subsection (D), and the crime must have effects on the commerce of the United States under subsection (E). At the very least, there is ambiguity in the statute, and, if for no other reason, the rule of lenity compels the conclusion that the two subdivisions be understood as merits-related elements of the crime. Because the indictment does not charge these elements, the indictment is legally insufficient, and, accordingly, the two material support counts must be dismissed.[6]

### i.   A Statute Should Be Construed So That No Part Will Be Inoperative Or Superfluous

"[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and alteration omitted).

The Second Circuit relied on this canon of construction in *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012), in connection with its construction of 18 U.S.C. § 1832, a statute

---

[5] We also separately argue that, for different reasons, the statute is unconstitutional as a violation of due process (even when subdivisions (D) and (E) are deemed elements of the offense) because other terms in the statute are vague, the defendant did not have adequate notice, and the defendant does not have an adequate opportunity to be heard.

[6] We argue below that the indictment is also legally insufficient because it fails to charge the requisite knowledge element of §2339B.

prohibiting the theft of trade secrets related to or included in "a product that is *produced for or placed in* interstate or foreign commerce." The lower court interpreted the phrase "produced for" broadly and determined that a product is "produced for" interstate or foreign commerce if its purpose is to facilitate or engage in such commerce.  The Circuit held this interpretation was untenable because it would render the disjunctive phrase "placed in" superfluous: "Since every product actually sold or licensed is by definition produced for the purpose of engaging in commerce, every product that is `placed in' commerce would necessarily also be `produced for' commerce--and the phrase `placed in' commerce would be surplusage." *Id*. at 80.

Relying on Supreme Court precedent, *Aleynikov* explained that, in any case, a statute should not be interpreted so as to render any part superfluous.  Moreover and importantly, the Court cautioned that judicial restraint against treating terms as surplusage is *heightened* when the words at issue describe an element of a criminal offense.  *Id.* at 80-81.  *See also, United States v. Kwan*, 607 F.3d 306, 313(2d Cir. 2010) ("`Canons of [statutory] construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise.'" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979); *see also Mizrahi v. Gonzales*, 492 F.3d 156, 164 (2d Cir. 2007).[7] This principle applies with equal force to Guidelines interpretation. `The Guidelines must be interpreted . . . so no words are discarded as meaningless, redundant or surplusage.' *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005).")

As in *Aleynikov*, in this case, subdivisions (D) and (E) must be read in the context of the overall statutory scheme and gather meaning from the subdivisions around them.  Unless they

---

[7] *Mirahi* cited with approval "*Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 270 n.1 (7th Cir. 1986) (observing that courts must not `rely too heavily on characterizations such as "disjunctive" form versus "conjunctive form" to resolve difficult issues of statutory construction,' but instead must `look at all parts of the statute')."

are given separate meaning and construed as elements of the offense, subdivisions (D) and (E) [the "offense" subdivisions of §2339B(d)(1)] would be superfluous: Since the "offender" subdivisions [(A), (B), (C) or (F)] are all encompassing and cover any person whether domestic or foreign, and since 18 U.S.C. § 3231 provides the district courts with "original jurisdiction … of all offense against the laws of the United States," there is no one who could be prosecuted based on either subdivision (D) or (E) who would not also be subject to "jurisdiction" under one of the all-encompassing "offender" subdivisions [i.e., (A), (B), (C) or (F)].[8]

To give meaning to the separate "offense" subdivisions of §2339B(d)(1), they should be interpreted as elements of the offense.  Neither U.S. citizens nor foreign persons can be prosecuted under §2339B unless their conduct occurred in whole or in part in the United States and unless the offense conduct occurred in or affected interstate or foreign commerce.

ii.   **Constitutionally Doubtful Constructions Should Be Avoided**.

Courts must "construe a federal statute to avoid constitutional questions where such a construction is reasonably possible." *Arnett v. Kennedy,* 416 U.S. 134, 162 (1974).  See also *Jones v. United States,* 529 U.S. 848, 850-1 (2000) (Court construes 18 U.S.C. § 844(i), which makes it a federal crime to damage or destroy "property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" as not covering an owner-occupied residence not used for any commercial purpose; construction of § 844(i) reinforced by both Court's opinion in *Lopez* striking the Gun-Free School Zones Act as beyond Congress's power to

---

[8] Every defendant in a criminal case has both a constitutional right and a right under Fed. R. Crim. P. 43 to be present at trial.  *United States v. Reiter*, 897 F.2d 639, 642 (2d Cir. 1990). Any person (whether domestic or foreign) who committed the offense (whether the conduct "required for the offense" was committed within or outside the United States)-- would have to fall within one of the "offender" subdivisions ((A), (B), (C), or (F)) in order to be prosecuted.

regulate commerce, "*and the interpretive rule that constitutionally doubtful constructions should be avoided where possible.*") (Citation omitted; emphasis added.)

If subdivisions (D) and (E) are *not* construed as elements of a §2339B offense, several constitutional questions emerge: among them are: (a) whether the regulation is tied to an enumerated power of Congress; (b) whether the statute is vague and standardless, allowing for discriminatory enforcement and violating the principle that legislative powers are non-delegable; (c) whether the statute violates the due process notice/opportunity-to-be-heard rights of those charged.  The Court should interpret subdivisions (D) and (E) as setting forth necessary elements of the offense in order to avoid these constitutional issues.

      a.  The power of Congress to regulate – exterritorialy or otherwise – is not absolute.  It must be tied to a power enumerated in the Constitution.  *McCullough v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819); see also *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.").

In enacting §2339B in 1996, Congress identified two constitutional sources of power that, it said, allowed it to impose penalties relating to the provision of material support to foreign terrorist organizations: "the power to punish crimes against the law of nations" and  "to carry out the treaty obligations of the United States".  See Section 301(a)(2) of Pub. L. 104-132 ("Findings" and "Purpose"). Congress also declared that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States." *Id*., at section 301(a)(4).

As originally passed, however, §2339B did not reference any of these sources.  Rather, the statute simply stated in general terms that it applied to anyone "within the United States or subject to the jurisdiction of the United States" and that "there is extraterritorial Federal jurisdiction over an offense under this section."[9]

In 2004, both of the provisions quoted in the preceding footnote were amended.  The language "within the United States or subject to the jurisdiction of the United States" was stricken from subsection (a)(1) (and Congress clarified the *mens rea* required for the offense by adding to the end of subsection (a)(1) the language requiring knowledge of either the designation or the activities of the foreign terrorist organization).  Subsection (d) ("Extraterritorial Jurisdiction") was also amended and, under a new subdivision (1) (which opens with "In general. - There is jurisdiction over an offense under subsection (a) if-"), Congress added the various offender-based and offense-based subsections ((A)-(F)) discussed above.[10]

Notably, the 2004 amendments to §2339B followed on the heels of the Second Circuit's salient opinion in *United States v. Yousef*, 327 F.3d 56 (2d Cir.), *cert. denied*, 540 U.S. 933 (2003), where the Court was presented with a substantial challenge to the exercise of criminal jurisdiction over a non-citizen for conduct committed abroad. The amendments to §2339B

---

[9]  The statute originally provided:

    (a) Prohibited Activities. –

        (1) Unlawful conduct. – Whoever, within the United States or subject to the jurisdiction of the United State, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

        ***
    (d) Extraterritorial jurisdiction.  -- There is extraterritorial Federal jurisdiction over an offense under this section.

[10]  §2339B was amended in other ways as well in 2004; these are not pertinent to this discussion.

directly correspond to two significant issues addressed by the *Yousef* Court  -- universal jurisdiction under the law of nations, and due process -- both of which, *Yousef* recognized, affect the ability of the United States to impose its criminal laws on all people anywhere in the world.

Yousef was charged with violating 18 U.S.C. § 32(b)(3) for placing a bomb on a civilian aircraft registered to a foreign country that was flying between two destinations outside of the United States. [11]  There was no evidence that any United States citizens were aboard the flight or were targets of the bombing. However, there was evidence that the bombing was a test-run executed in preparation for a plot to destroy United States commercial aircraft in order to influence United States foreign policy.

Yousef challenged the power of Congress to criminalize his extraterritorial conduct, claiming*, inter alia*, that it violated both customary international law limiting a nation's jurisdiction to proscribe conduct outside its borders, as well as the Due Process Clause of the Fifth Amendment.  The Circuit ultimately rejected Yousef's challenges, finding three sources of "jurisdiction" and due process: under domestic law 18 U.S.C. § 32; under jurisdiction created by the Montreal Convention; and under the protective principle of customary international law (which "permits a State to assume jurisdiction over non-nationals for acts done abroad that affect the security of the State".) *Id.* at 92, 110.

In reaching this conclusion, however, *Yousef* made two important points on the limits of Congress's authority to criminalize extraterritorial conduct:  (1) it held (contrary to the District Court) that "*terrorism – unlike piracy, war crimes, and crimes against humanity – does not provide a basis for universal jurisdiction*," *id.* at 108 (emphasis added), and, therefore,

---

[11] § 32(b) (3) criminalizes, *inter alia*, the placing of a destructive device on any aircraft operated overseas, and provides, in part: "There is jurisdiction over an offense under this subsection if a national of the United States was on board, or would have been on board; an offender is a national of the United States; or an offender is afterwards found in the United States."

Congress's power to criminalize specific acts relating to "terrorism" committed abroad must derive from some other authority (such as a treaty or some other principle of customary international law—for example, the protective principle which it found applicable in Yousef's case since Yousef was ultimately targeting the U.S.), *id.* at 109-110; and (as discussed above) (2) in order for a federal criminal statute to apply extraterritorially to a defendant *"consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair,"* *id.* at 111 (quoting *United States v. Davis,* 905 F.2d 245, 248-49 (9th Cir. 1990); (emphasis added)).[12]

§§ 2339B(d)(1)(D) and (E) – which were added to §2339B shortly after *Yousef* was decided – attend to both of these issues*:* subdivision (E) identifies the Commerce Clause as the source of Congress's power to criminalize extraterritorial conduct by non-nationals; and subdivision (D) sets forth a territorial nexus with the United States without which application of the law to non-nationals based exclusively on foreign conduct might be arbitrary and fundamentally unfair.

In light of this, both of the added "offense-related" provisions should be read as setting forth essential elements of the offense. The statute, by its terms, is not related to a valid international treaty or universally condemned conduct, *see also United States v. Bahlul,* 2014 U.S. App. LEXIS 13287, *68 (D.C. Cir. July 14, 2014) ("The Government concedes that material support is not an international law-of-war offense"), and, therefore, there must be some other source of Congressional authority for the statute to survive constitutional attack. The commerce clause provides authority, but without subdivisions (D) and (E), §2339B "by its

---

[12] The Circuit reiterated this due process requirement of a territorial nexus in *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011), and most recently in *United States v. Yousef,* 750 F.3d at 258.

terms" would have "nothing to do with `commerce' or any sort of economic enterprise," *Lopez,* 514 U.S. at 561, and would not be tied to protecting the security of the United States. In sum, the statute would contain "no jurisdictional element which would ensure, through case-by-case inquiry, that" the rendering of material support abroad was within the power of Congress to regulate, *Lopez,* 514 U.S. at 562, and, without any territorial nexus whatsoever, the statute would exceed constitutional bounds when applied to foreigners' conduct abroad.

Reading §§2339(d)(1)(D) and (E) as elements of the offense avoids these constitutional problems. It also allows the court to avoid issuing unnecessary constitutional rulings.  See *American Foreign Service Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) ("courts should be extremely careful not to issue unnecessary constitutional rulings").

(For several reasons, it cannot be that the Secretary of State's designation of the organization as a foreign terrorist organization pursuant to 8 U.S.C. § 1189 establishes either Congress's power to regulate under the commerce clause- or the territorial nexus between *the defendant's* conduct and the United States necessary to satisfy due process.  See *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 320 (1936) (national government's "foreign affairs" power, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.")

First, the Secretary's designation criteria are not confined to the enumerated powers of Congress, and there is, therefore, no insurance that the Secretary's designation works to limit the activity regulated in the law to the kind of activity that Congress is empowered to regulate. See *United States v. Jenkins*, 909 F. Supp. 2d 758, 770 (E.D. Ky. 2012)  ("A jurisdictional element is a limiting factor contained in the statute that would ensure on a case-by-case basis that the activity regulated in a statute has the required nexus with interstate commerce. [*Lopez,* 514 U.S.

at 562]  Jurisdictional elements, often called "hooks," are inherently only sufficient to fulfill their purpose when they either limit the regulation to interstate activity or ensure that the interstate activity that is regulated falls within one of the three categories of congressional power.")

The designation criteria under 8 U.S.C. § 1189(a)(1)(C) require that "the terrorist activity or terrorism of the organization threatens the security of United States nationals or national security of the United States."   This latter term ("national security") is defined broadly in § 1189(d)(2) as "national defense, foreign relations, or economic interests of the United States." Congress's enumerated powers, however, include the power to define and punish "offences against the Law of Nations" and "to regulate Commerce with foreign Nations," not to extend its legislation into the territories of foreign states merely in the service of such general interests as "foreign relations" or the "economic interests" of the United States.  See *Perez v. Brownell,* 356 U.S. 44, 58 (1958) ("The restrictions confining Congress in the exercise of any of the powers expressly delegated to it in the Constitution apply with equal vigor when that body seeks to regulate our relations with other nations.")

A second reason not to read the Secretary's designation as providing the jurisdictional "hook" (that ensures on a case-by-case basis that a particular activity covered under §2339B has the required nexus with an enumerated power of Congress) is that, under the designation provisions, a criminal defendant in a criminal action is **not** "permitted to raise any question concerning the validity of the issuance of the of such designation as a defense or an objection at any trial or hearing."   8 U.S.C.  §  1189(a)(1)(8).   The inability of a criminal defendant to challenge jurisdiction would present additional constitutional problems with §2339B (discussed

in the footnote below).[13]  *Cf. American Civil Liberties Union v. Clapper*, 959 F. Supp. 2d 724, 742 (SDNY 2013) (while "clear from the statutory scheme that Congress intended to preclude statutory causes of action such as this," "this says nothing about the ACLU's constitutional claims and it is hard to imagine a regime where they would be barred.  A constitutional claim is precluded only on a `heightened showing' demonstrating a clear intent to do so.  And there is no language in FISA expressly barring a constitutional claims." (Citations omitted.)); *American Civil Liberties Union v. Clapper,* Second Circuit Docket No. 14-42 (at oral argument (videotaped

---

[13] If the Secretary's designation of the organization provides the requisite jurisdictional element, then (in order to ensure on a case-by-case basis that the activity criminalized by the statute has the required nexus with the power to regulate), the organization's threat to the security of United States nationals or the national security should be subject to proof beyond a reasonable doubt and a defendant charged with §2339B would have the due process right to be heard on this issue. The statutory provision preventing a defendant from challenging this issue would then appear to violate due process. *Cf. United States v. Barone*, 71 F. 3d 1442, 1445-6 (9th Cir. 1994) (where Congress chose to limit application of 18 U.S.C. § 513 to cases in which the general activities of the *organization* affect interstate or foreign commerce, rather than basing jurisdiction on the interstate effects of the *offense conduct*, government required to prove, as a "necessary jurisdictional element," the organization's affect on interstate commerce); *Toler v. McGinnis,* 23 Fed. Appx 259, n. 7 (6th Cir. 2001) (noting that several state courts have determined that "jurisdiction is a factual question to be decided by the jury when the facts necessary for jurisdiction are in dispute and intertwined with the merits of the case."). See generally *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) ("[the Due Process Clause and Sixth Amendment right to a jury trial] indisputably entitle a criminal defendant to a 'jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'" (internal citations omitted)); *accord, e.g., In re Winship*, 397 U.S. 358, 364 (1970) ("We explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *United States v. Gaudin*, 515 U.S. 506 (1995); *Patterson v. New York*, 432 U.S. 197, 209-10, (1977) ("The Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which Perrien is charged."); *Mullaney v. Wilbur*, 421 U.S. 684 (1975).

Even if, assuming *arguendo*, the basis for Congress's prescriptive jurisdiction were not an "element," it is nevertheless an issue that must be considered and decided by the court.  See *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (nexus – that is, "a connection between the criminal conduct and the United States sufficient to satisfy the United States' pursuit of its interests" – is part of the jurisdictional inquiry, but it is for the court, not the jury).  Precluding *any* judicial review would deprive a criminal defendant of due process.

by C-SPAN) government concedes that Congress did not preclude judicial review of a customer's *constitutional* challenge to Section 215 telephony metadata collection program.) These constitutional issues also would be avoided by reading §§2339B(d)(1)(D) and (E) as elements of the offense.)

> b.   Construing subsections (D) and (E) as elements of the offense (and not simply as alternatives to the offender-related subsections as a basis for the "jurisdiction" over defendants whose conduct was committed abroad) also avoids a constitutional challenge that the statute is vague, standardless, and allows for discriminatory enforcement.   If there were no requirement that any of the offense conduct occurred in the United States or that any of the offense conduct occurred in or affected interstate or foreign commerce, then application of the statute to foreigners (like the defendants here) who (allegedly) committed all conduct abroad (and never set foot in or communicated with anyone in the United States or targeted the United States) would depend entirely on the whim of the Executive: under subsection (C), only those foreigners whom the Executive chose to bring into the United States would be subject to the law.  This would violate due process.   See *United States v. Williams,* 553 U.S. 285, 304 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.") See also, *Reynolds v. United States,* 132 S.Ct. 975, 986-7 (2012) (Scalia, J., dissenting) ("Indeed, it is not entirely clear to me that Congress can constitutionally leave it to the Attorney General to decide--with no statutory standard whatever governing his discretion--whether a criminal statute will or will not apply to certain individuals. That seems to me sailing close to the wind with regard to the principle that legislative powers are nondelegable, see *Whitman* v. *American*

*Trucking Assns., Inc.*, 531 U. S. 457, 472-476, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001); *Loving* v. *United States*, 517 U. S. 748, 776-777, 116 S. Ct. 1737, 135 L. Ed. 2d 36 (1996) (Scalia, J., concurring in part and concurring in judgment), and `[i]t is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.' *Gomez* v. *United States*, 490 U. S. 858, 864, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989).")

> iii.    There Is A "Presumption That United States Law Governs Domestically But Does Not Rule The World."
>
> Statutes Should Be Construed So As To Comport With International Law.
>
> The Presumption Against Extraterritoriality Is Not Defeated Even When Congress Specifically Addresses An Issue of Extraterritorial Application.

"It has been a maxim of statutory construction since the decision in *Murray* v. *The Charming Betsy*, 6 U.S. 64, 2 Cranch 64, 118, 2 L. Ed. 208 (1804), that `**an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains**.'" *Weinberger* v. *Rossi*, 456 U.S. 25, 32 (1982) (emphasis added).

This maxim has particular application when the issue is whether Congress intended a statute to apply to conduct outside the territorial jurisdiction of the United States. While,   as   a general proposition, Congress has the authority to "enforce its laws beyond the territorial boundaries of the United States," *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991), courts recognize "the common sense notion that Congress generally legislates with domestic concerns in mind." *Smith v. United States,* 507 U.S. 197, 204 n.5 (1993).

There is a "**presumption that United States law governs domestically but does not rule the world**,"*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013) (quoting

*Microsoft Corp. v. AT&T Corp.,* 550 U.S. 435, 455 (2007); emphasis added), and thus, in determining whether a statute applies to conduct overseas, Courts apply another canon of statutory construction -- **the presumption against extraterritoriality**: "`unless there is the affirmative intention of the Congress *clearly expressed*' to give a statute extraterritorial effect, `[Courts] must presume it is primarily concerned with domestic conditions.'" *Morrison v. National Australia Bank Ltd.,* 561 U.S. at 255 (citations omitted) (emphasis added).

    (In 2013, the Second Circuit, in *United States v. Vilar,* 729 F.3d 62 (2d Cir. 2013), rejected the Government's argument that "`the presumption against extraterritoriality … simply does not apply in the criminal context.' Gov't Br. 96." *Id.* at 72. It held that the presumption that Congress does *not* intend for a statute to apply to conduct outside the territorial jurisdiction of the United States applies whether the statute is civil or criminal in nature, and criticized the Government for ignoring the fundamental purposes of the presumption: "The Supreme Court has emphasized that we apply this rule of statutory interpretation because we understand that `Congress generally legislates with domestic concerns in mind,' *Smith*, 507 U.S. at 204 n.5, and because the presumption `serves to protect against unintended clashes between our laws and those of other nations which could result in international discord,' *Kiobel*, 133 S. Ct. at 1664 (internal quotation marks omitted).[14] We discern no reason that these concerns are less pertinent

---

[14] In *United States v. Cardales-Luna,* 632 F.3d 731 (1st Cir. 2011), Judge Torruella, writing in dissent, *id.* at 751 n.17, noted the objections that have been raised by the United States when other nations have attempted to exercise extra-territorial jurisdiction over American citizens:

> The United States has resisted attempts to exercise extra-territorial jurisdiction over its citizens by other nations**.** See, Press Statement, Richard Boucher, U.S. Dep't of State, International Criminal Court: Letter to UN Secretary General Kofi Annan (May 6, 2002) at http://www.state.gov/r/paprs/2002/9968.htm. See also, Marise Simons, Spanish Court Weighs Inquiry on Torture for 6 Bush-Era Officials, N. Y. Times, Mar. 28, 2009, at A6, available at http://www.nytimes.com/2009/03/29/world/europe/29

in the criminal context." *Id.* at 74. Notably, the indictments in the instant case were filed in 2012 when the Justice Department held the erroneous view that there was no presumption against extraterritoriality – a presumption that, we now show, is not defeated simply because the statute addresses the issue of extraterritorial application.)

In determining whether a statute contains a clear indication of Congress's intent to provide for extraterritorial application – or, stated differently, whether Congress "by clear statement, overrode the presumption against extraterritoriality," *Loginovskaya v. Batratchenko,* 764 F.3d 266, 271 (2d Cir. 2014) -- other rules of statutory construction come into play:

(1) **The presumption against extraterritoriality is not defeated simply because the statute specifically addresses an issue of extraterritorial application**: "when a statute provides for *some* extraterritorial application, the presumption against extraterritoriality operates to limit *that provision* to its terms**."** *Loginovskaya,* 764 F. 3d at 271 (quoting *Morrison,* 561 U.S. at 265, 130 S.Ct. at 2883, and adding emphasis). See also *Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437, 455-456 (2007) ("as this Court has explained, `the presumption is not defeated . . . just because [a statute] specifically addresses [an] issue of extraterritorial application,' *Smith* v. *United States*, 507 U.S. 197, 204, 113 S. Ct. 1178, 122 L. Ed. 2d 548 (1993); it remains instructive in determining the *extent* of the statutory exception.") (citing, *F. Hoffmann-LaRoche Ltd. v. Empagran*, *S.A.,* 542 U.S 155, 161-162 (2004) ("*Empagran"*); *Smith v. United States*, 507 U.S. 197, 204 (1993)). Moreover, references in the text to phrases like

---

spain.html?+baltazargarzon (describing complaint under Judge Baltazar Garzón's review asserting that Spain has jurisdiction over U.S. officials under, inter alia, the 1984 Convention Against Torture, which is binding on the United States); David Bosco, The Inquisition, Part II?, Washington Post, May 24, 2009, at BO2 (discussing Spain's judicial activism in the context of U.S. detention policies at Guantanamo Bay); cf. Rachel Donadio, Italy Convicts 23 Americans for C.I.A.Renditions, N. Y. Times, Nov. 2009, at A15, available at http://www.nytimes.com/2009/11/05world/ europe/05/italy.html.

"national public interest" or "interstate commerce" are insufficient to overcome the presumption. *Morrison*, 561 U.S. at 262-263.

(2) The *Charming Betsy* maxim that "**an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.**" See also *Empagran*, 542 U.S. at 164 ("this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. … This rule of construction reflects principles of customary international law--law that (we must assume) Congress ordinarily seeks to follow.  See Restatement (Third) of Foreign Relations Law of the United States §§ 403(1), 403(2) (1986) (hereinafter "Restatement") (limiting the unreasonable exercise of prescriptive jurisdiction with respect to a person or activity having connections with another State); *Murray v. Schooner Charming Betsy,* 6 U.S. 64, 2 Cranch 64, 2 L. Ed. 208 (1804) (`[A]n act of Congress ought never to be construed to violate the law of nations if any other possible  construction remains'); *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 817, 125 L. Ed. 2d 612, 113 S. Ct. 2891 (1993) (Scalia, J., dissenting) (identifying rule of construction as derived from the principle of `prescriptive comity').")  *See also United States v. Bin Ladn*, 92 F. Supp. 2d 189, 214 (SDNY 2000) ("Courts are to presume… that Congress generally intends its statutes to be consistent with international law. …This presumption can be overcome only by a clear statement of intent to override international law.") (Citing, *inter alia, Cook v. United States*, 288 U.S. 102, 119-20 (1933).) No such expression of intent to override or ignore the sovereign authority of other nations appears in either the text or (so far as we have been able to find) the legislative history of §2339B.

There is no doubt that Congress intended to give §2339B *some* extraterritorial application. However, the extent of that application is, at best, unclear given the inclusion of §§2339B(d)(1)(D) and (E) which, on their face, impose limits on extraterritorial reach. Indeed, the requirement that at least some conduct occur in the United States and the requirement that the offense conduct affect interstate or foreign commerce are consistent with, and show Congressional respect for, international law, not an intent to breach it.

Restatement §§ 402 and 403 (set forth in the footnote below) articulate the general principles that a state may properly exercise regulatory or prescriptive jurisdiction over activities or persons connected with another state when "conduct outside its territory **has or is intended to have a substantial effect within its territory**," and only if the exercise of jurisdiction is "reasonable."[15]  The statute should not be construed as having boundless extraterritorial reach,

---

[15] See *United States v. Nippon Paper Industries Co., Ltd.*, 190 F. 3d 1, 11 (1st Cir. 1997) (Lynch, J., concurring) ("Restatement Section 402(1)(c) states that `Subject to § 403,' a state has jurisdiction to prescribe law to `conduct outside its territory that has or is intended to have substantial effect within its territory.' *Id.* § 402(1)(c). Section 403(1) states that, even when Section 402 has been satisfied, jurisdiction may not be exercised if it is `unreasonable.' *Id.* § 403(1). Section 403(2) lists factors to be evaluated in determining if jurisdiction is reasonable:

(a) the link of the activity to the territory of the regulating state, *i.e.,* the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

and cover wholly foreign conduct with no discernible conduct or effect in the United States, because this construction (not only would present all the constitutional issues discussed above but also) would allow for the violation of international law and undue interference with the sovereign authority of other nations. (This is especially so since, as discussed below, the statute defines "terrorist activity" so broadly as to include activities that are not unlawful in the place where committed including  "use of any … firearm …" during a war, and because several sovereigns have declared that acts of national resistance including armed resistance against foreign occupation and aggression with a view to liberation and self-determination do not qualify as acts of terrorism. *See* United Nations, *Multilateral Treaties Deposited with the Secretary-General: Status as at 31 December 2005*, 165, 166, 169 (2002) (Declarations of Egypt, Jordan and Syria).) *Cf. Empagran*, 542 U.S. at 169 ("We conclude that principles of prescriptive comity counsel against the Court of Appeals' interpretation of the FTAIA.   Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.")

The broad statement in § 2339B(d)(2) ("Extraterritorial jurisdiction – There is extraterritorial Federal jurisdiction over an offense under this section.") does not clearly

------

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.")

contradict the reading that the statute's extraterritorial reach is limited.  Nor does this provision

clearly express Congress's intent to render §§ 2339(B)(d)(1)(D) and (E) superfluous, and, "in an

act of legal imperialism, through legislative fiat," apply the statute to foreign conduct with no

discernible connection to the United States.  If anything, "when a statute provides for *some*

extraterritorial application, the presumption against extraterritoriality operates to limit *that*

*provision* to its terms**.**" *Morrison,* 561 U.S. at 265.

  Finally, even if Congress has *clearly* indicated its intent to reach all foreign conduct

without regard to whether there is any territorial nexus to the United States, the court is not

"bound to follow the Congressional direction [if] this would violate the due process clause of the

Fifth Amendment."  *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983) (internal

quotation marks omitted).  Reading the statute to eliminate all territorial connection would

violate due process and, therefore, Congress's directive should not be followed. The indictment

should be dismissed.

### 4.  Ambiguity In A Statute Should Be Resolved In Favor Of Lenity

  If nothing else, for the many reasons discussed above the statute is, at best, ambiguous

with regard to the extent of its extraterritorial reach.[16] It is a "familiar principle" that "'ambiguity

---

[16] The statute lumps different kinds of "jurisdiction" together in a single subsection, and includes both these specific "jurisdictional" provisions as well as a general provision that there is "extraterritorial Federal jurisdiction over an offense under this section" under the umbrella of "Extraterritorial Jurisdiction." In his article, *What Is Extraterritorial Jurisdiction?,* Professor Colangelo explains why the term "extraterritorial," like the term "jurisdiction," is ambiguous and open to interpretation:

> Like jurisdiction, the word "extraterritorial" requires elaboration. Also like jurisdiction, it is a legal construct whose use can vary depending on the point being made. It obviously indicates something along the lines of "beyond . . . territorial limits."  But that in itself may not be very helpful. Many activities or events we might think of as outside a territory can be recharacterized as inside a territory.

For a classic prescriptive jurisdiction example, if Jane fires a gun in State A across the border into State B, and the shot hits and kills Dick in State B, where did the act occur? The answer depends on which part of the transaction we focus. If it is Jane's conduct—firing the gun—the act occurred in State A. If it is the effect of Jane's conduct—Dick being shot and killed— the act occurred in State B. The fields of conflict of laws (or private international law) and public international law have long dealt with these types of questions in multistate systems. These fields offer good analytical starting points both because of their robust intellectual history with extraterritorial-jurisdiction questions and because they conceptually and doctrinally inform recent Supreme Court jurisprudence on extraterritoriality.

To return to our shooting hypothetical, traditional choice-of-law or private international law rules would resolve the conundrum by selecting one element of the multijurisdictional transaction and then localizing the entire transaction based on that element. Accordingly, if the relevant choice-of-law rule says the key element is where the harm ultimately is felt, the act took place (or, using traditional choice-of-law terminology, the cause of action arose) in State B. State B therefore may apply its laws to the act as a matter of State B's territorial jurisdiction. In other words, State B would not be exercising extraterritorial jurisdiction if it applied its laws to Jane in the hypothetical. On the other hand, if the choice-of-law rule says that the key element is where Jane's conduct setting the harm in motion occurs, State A has territorial jurisdiction.

Further complicating matters is the possibility that State A and State B might have different choice-of-law rules, leading to either both states or neither state having territorial jurisdiction over the act. To illustrate, State A's rule might say that the conduct—Jane firing the gun—is the key jurisdictional element while State B's rule might say that the harm—Dick being shot—is the key jurisdictional element. Both states could claim territorial jurisdiction on the same facts. Or State A's rule may say it is the harm and State B's rule may say it is the conduct that establishes territorial jurisdiction—in which case neither state has territorial jurisdiction. Familiarizing ourselves with this type of localization approach now will be useful later since it features prominently in recent Supreme Court opinions addressing whether and when U.S. law applies to claims involving foreign elements.

The line between territorial and extraterritorial is abstruse or at least elusive in public international law as well. And, like private international law, public international law rules tend to analytically and doctrinally inform judicial analysis of U.S. prescriptive jurisdiction. In the shooting hypothetical, State A and State B both might claim territorial jurisdiction under public international law: State A on the basis of subjective territoriality, which authorizes jurisdiction over acts occurring in part in a state's territory (thereby covering Jane's conduct in

concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Skilling* v. *United States*, 561 U. S. 358, 410 (2010). When a criminal statute has two possible readings, the rule of lenity requires a court not to "'choose the harsher alternative'" unless Congress has "'spoken in language that is clear and definite.'" *United States* v. *Bass*, 404 U. S. 336, 347-349 (1971).

The rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, "a reasonable doubt persists" regarding whether Congress has made the defendant's conduct a federal crime, *Moskal* v. *United States*, 498 U. S. 103, 108 (1990)—in other words, whenever those tools do not decisively dispel the statute's ambiguity. *Skilling*, *supra,* at 410. "[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct . . . we apply the rule of lenity and resolve the ambiguity in [the defendant]'s favor." *United States* v. *Granderson*, 511 U. S. 39, 54 (1994).

It cannot be said that the text, structure, and history of §2339B establish as "unambiguously correct" that the statute makes foreign conduct -- with no territorial nexus to the United States through either conduct and/or effects -- a federal crime. See also *United States v. Aleynikov,* 676 F.3d at 82 ("Even if we were to conclude that the phrase `produced for . . . interstate or foreign commerce' is susceptible to a broader reading than we think it will bear, it would at most render §1832(a) facially ambiguous, which would not assist the prosecution. `[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'

---

firing the gun), and State B on the basis of "objective territoriality," which authorizes jurisdiction over acts abroad that have, or are intended to have, effects within a state's territory (thereby covering the impact of the shot on Dick). These varying conceptualizations of territoriality will be covered in more detail below; the point here is only to illustrate that, like other legal concepts, territorial and extraterritorial are variable and open to interpretation.

99 Cornell L. Rev: 101, 110-111 (footnotes omitted).

*Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971). And `when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.' *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22, 73 S. Ct. 227, 97 L. Ed. 260 (1952).")

Here, because the language of the statute is neither clear nor definite, the rule of lenity requires that subdivisions §2339B(d)(1)(D) and (E) be read as limits on the extraterritorial reach of the statute.  Since the indictment charges no conduct that occurred in the United States and charges no effect of any conduct on interstate or foreign commerce, it fails to state an offense. Counts 1 and 2 should be dismissed.

### c.   **If §§ 2339B(d)(1)(D) And (E) Are Not Elements, 18 U.S.C. § 2339B Is Unconstitutional**

In the event that the Court disagrees with the defendant, and determines that §§ 2339B(d)(1)(D) and (E) are not elements of the material support offense, then the statute is unconstitutional for all the reasons suggested above: §2339B is not tied to an enumerated power of Congress; the statute is vague and standardless, allowing for discriminatory enforcement and violates the principle that legislative powers are non-delegable; and the statute violates the due process notice/opportunity-to-be-heard rights of those charged.

### d.   **The Invalidity Of Counts 1 and 2 Also Undermines The Firearm Count**

Moreover, though as argued below we do not agree with the proposition, to the extent that Count 3, the firearm charge, is dependent on the validity of the charges in Counts 1 and 2 (in that the jurisdictional element of the material support counts serve as the jurisdictional foundation for the firearm count), the failure to charge the conduct and effects required by §2339B(d)(1)(D) and (E) in Counts 1 and 2 is fatal to the firearm count as well.  *Cf. United*

*States v. Staples,* 85 F.3d 461, 463 (9th Cir. 1996) (Court rejects "*Lopez"* challenge to § 924(c)(1) because underlying felony contains a jurisdictional element which ensures, "through case-by-case inquiry, that the firearm possession in question affects interstate commerce. *Lopez,* 115 S.Ct. 1631).")

     e.  **All Counts Must Be Dismissed Because The Underlying Statute, 18 U.S.C. § 2339B, Is Unconstitutionally Vague**

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.  All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972):

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id.,* at 108-109 (footnotes omitted),

This prosecution violates both prongs of the void-for-vagueness doctrine. 18 U.S.C. § 2339B's knowledge requirement – which uses terms the definitions of which are set forth in other statutes that are incorporated by reference – does not afford either sufficient notice of what is prohibited or adequate standards for authorities tasked with enforcing the law.

18 U.S.C. § 2339B(a)(1) imposes criminal liability on anyone who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do

so." The statute expressly conditions liability on a person having knowledge of one of three attributes of the relevant organization: (1) "that the organization is a designated terrorist organization (as defined in subsection (g)(6))"; (2) "that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act)"; or (3) "that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."  Defendant's vagueness challenge focuses on the second knowledge requirement, "that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act)."[17]

First, "section 212(a)(3)(B) of the Immigration and Nationality Act", 8 U.S.C. § 1182(a)(3)(B), has a number of subdivisions, several of which define different terms.  Among them are subdivision (iii) "Terrorist Activity Defined" and subdivision (iv) "Engage in Terrorist Activity Defined."  These are different terms under the Immigration and Nationality Act, and each is defined differently.

Depending on where one puts the quotes, both the terms "terrorist activity" and "engage[] in terrorist activity" can be found in 18 USC §2339B.  However, since 18 USC § 2339B references only "section 212(a)(3)(B) of the Immigration and Nationality Act," and does not either reference a specific subdivision of section 212(a)(3)(B) or put quotes around any of the

---

[17] In *Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010), the Supreme Court rejected a facial vagueness challenge (involving four types of material support – "training," expert advice or assistance," "service", and "personnel") and concluded that the material-support statute is constitutional as applied to the particular activities the plaintiffs told the Court they wished to pursue.  It specifically did not "address the resolution of more difficult cases that may arise under the statute in the future." *Id.* at 8.  The Second Circuit rejected a similar challenge involving the nature of the support rendered in *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011).  Neither case addressed the statutory knowledge requirement we raise here.

language, it is not clear what term 18 U.S.C. § 2339B's reference to the Immigration and Nationality Act is meant to define -- "terrorist activity" or "engage in terrorist activity"?   A person – particularly a foreign person having no contact with the United States – should not have to guess before being haled into federal court for a criminal prosecution.

In a recent civil case, the Second Circuit (without discussing or considering the issue raised here) selected "engage in terrorist activity" as the relevant phrase.  Thus, it read §2339B as "explicitly" incorporating the definition of "engage in terrorist activity" found in subdivision (iv): "Section 2339B(a)(1) explicitly incorporates the meaning of `engage[] in terrorist activity' from §212(a)(3)(B) of the Immigrations and Nationality Act, 8 U.S.C. § 1182(a)(3)(B)(iv)(IV)…" *Weiss v. National Westminster Bank PLC,* Docket No. 13-1618-cv, 2014 U.S. App. LEXIS 18061, *14 (2d Cir. September 22, 2014).  The Circuit just as easily could have read §2339B as "explicitly" incorporating the definition of "terrorist activity" found in subdivision (iii).  A statute that permits prosecutors and judges to pick and choose the meaning of its terms is a statute that not only fails to provide clear warning as to what is prohibited, but also is one that invites arbitrary and discriminatory enforcement.

The expansive definition of "terrorist activity" in 8 U.S.C. § 1182(a)(3)(B)(ii) creates a further vagueness problem.  Under 8 U.S.C. § 1182(a)(3)(B)(ii), the "term `terrorist activity' means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves" any of five types of activity: (I) highjacking or sabotage of any conveyance; (II) kidnapping; (III) violent attack on an internationally protected person; (IV) assassination; and  (V) the use of any (a) biological agent, chemical agent, or nuclear weapon or device, or (b) "explosive, firearm or other weapon or dangerous device …

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property".

The last category presents the problem.  Unlike the other categories (which are the subject of various specialized international conventions),[18] the definition in subdivision (iii)(V)(b) is so broad it encompasses traditionally local activities – just as an example, gang violence in Amsterdam.  Even if one knew that an organization one supported engaged in such activity, the statute would not provide a foreign actor with fair warning that providing support to the organization violated U.S. law or could subject one to criminal prosecution in the United States -- – especially if the only basis for "jurisdiction" is that *after* he committed certain conduct, U.S. officials determined to bring him against his will to the United States.

While citizens, residents, or aliens acting within the territorial jurisdiction of the United States "may be charged with knowledge of the United States Statutes at Large," and while "the appearance of rules and regulations in the Federal Register" may give such individuals legal notice of their contents," *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-5 (1947), the same cannot be said with respect to foreigners acting abroad.  A foreign person who is not charged with committing any conduct either in the United States or with any effect on the United States does not have fair warning that, simply by supporting an organization that engages in violent conduct abroad, he commits a crime against the U.S.  There is no basis for presuming

---

[18] See, e.g., International Convention for the Suppression of Terrorist Bombings, GA res. 52/164, 15 December 1997 (1998), 37 ILM 249; Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, 14 December 1973, 28 1035 U.N.T.S. 167; International Convention Against the Taking of Hostages, 17 December 1979, 1316 U.N.T.S. 205; Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, 23 September 1971, 974 U.N.T.S. 177; Montreal Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving Civil Aviation, 24 February 24 1988, 27 I.L.M. 627; Hague Convention for the Suppression of Unlawful Seizure of Aircrafts, 16 December 1970, 860 U.N.T.S. 105; Tokyo Convention on Offences and Certain Other Acts Committed on Board Aircraft, 14 September 1963, 704 U.N.T.S. 219.

such a person's knowledge of U.S. law or for finding he was adequately warned of the international consequences of his conduct.

If a defendant directs some harmful action against the U.S. or U.S. interests, it may not be arbitrary or unfair to deem him on notice that his conduct is illegal under U.S. law and that he may in fact be subject to that law. Similarly, when the defendant's conduct is universally condemned (such as piracy or blowing up an airline), the defendant may not be heard to complain lack of notice of another sovereign's law as applied to him. *See e.g. United States v. Naseer,* 2014 U.S. Dist. LEXIS 108933, *6 (EDNY 2014) (Defendant charged with conspiring a coordinated attacks in the U.S., the U.K., and Norway. Court holds, "There is no question that a defendant who allegedly plotted to bomb targets in the United Kingdom on behalf of al-Qaeda would reasonably have understood that his conduct was criminal, whether or not he knew with specificity that he could be subject to prosecution in the United States.")

But here, the conduct is not a universally condemned international crime. To the contrary, the conduct described in 8 U.S.C. § 1182(a)(3)(B)(V)((b) is quintessentially local and one aware of it or supporting it or engaged in it does *not* have due notice that his conduct violates U.S. law. Stated simply, a Dutch man who engaged in gang violence in the Netherlands does not have fair notice that he engaged in "terrorist activity" and was potentially subjecting himself to United States law if, unbeknownst to him, the United States designated the gang a foreign terrorist organization. Nor does the defendant in this case who is not specifically charged with knowing that al-Shabaab was designated as a foreign terrorist organization by the Department of State or with having had any connection to or aims directed against the United States. Application of §2339B to defendant, a foreign person abroad, is arbitrary, fundamentally unfair, and violates of due process.

**f.   Count 3 Should Be Dismissed: 18 U.S.C. § 924(c) Does Not Have Extraterritorial Application, And If It Does, Its Application To Defendant Violates Due Process.**

We argued above that Count 3 should be dismissed because the underlying predicates charged in Counts 1 and 2 were defective for failing to charge two elements essential for the exercise of extraterritorial jurisdiction under 18 U.S.C. § 2339B – i.e., that the offense occurred in whole or in part with the United States, and that the offense occurred in or affected interstate or foreign commerce.  Here, we argue that, in light of the presumption against extraterritorial application of criminal laws, and the absence of anything in the statute expressly pointing to extraterritorial application, 18 U.S.C. § 924(c) does not reach extraterritorial weapons possession.  While we appreciate that the Second Circuit rejected this argument in *United States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012), *Siddiqui* rests on shaky ground.

First, *Siddiqui* relied principally on the proposition that the presumption against extraterritoriality does not apply in criminal cases – a proposition subsequently rejected by the Second Circuit in *United States v. Vilar,* 729 F.3d at 74.  It also pointed to *United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010), a case where the Eleventh Circuit took a broader view of a limited exception to the presumption against extraterritoriality set forth in *United States v. Bowman,* 260 U.S. 94, 98 (1922), than was demarcated by the Second Circuit in *Vilar. See Vilar*, 729 F.3d at 73 (relevant statute must "either contain a clear indication of Congress's intent to provide for extraterritorial application *or relate to crimes against the United States government*.") (Emphasis added.)

The holding in *Siddiqui* requires reconsideration.  In this regard, we join in the arguments made by co-defendant Ahmed and incorporate by reference the analysis offered by David Keenan and Sabrina P. Shroff, in *Taking the Presumption Against Extraterritoriality Seriously in*

*Criminal Cases after Morrison and Kiobel,* 45 Loyola University Chicago Law Journal 71, 108-122 (2013).

Moreover, even if, in some cases, §924(c) has extraterritorial application where the underlying statute applies extraterritorially, as applied in the peculiar circumstances of this case (where extraterritorial jurisdiction over the §2339B offense is not based on the conduct required for the offense but, rather, on subsequent actions by government agents who determined to bring the defendants into the United States), the statute is void for vagueness and the concept of ancillary jurisdiction violates due process. A defendant does not have adequate notice of the conduct that is prohibited if, ultimately, the determination of whether the conduct violates U.S. law is up to arresting agents.

### g. The Indictment Does Not Fairly Inform Defendant Of The Charges Against Him.

The requirement of Rule 7(c), Fed. R. Crim. P., that the indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged," serves to guarantee constitutional rights: the Fifth Amendment rights to indictment by a grand jury, protection against double jeopardy, and due process; and the Sixth Amendment right "to be informed of the nature and cause of the accusation". *Russell v. United States,* 369 U.S. 749, 760-766 (1962). A deficiency in an indictment cannot be saved by a bill of particulars. *Id.* at 770.

An indictment is not sufficient unless it charges a crime with sufficient precision to inform the defendant of the charges and allow him to prepare a defense, and with enough detail that he may invoke double jeopardy against any subsequent prosecution for the same offense. *Russell v. United States,* 369 U.S. at 763-64; *United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998). An indictment is sufficient if it contains all of the elements of the offense charged, and while "an indictment need do little more than to track the language of the statute charged," it

must also "state the time and place (in approximate terms) of the alleged crime." *United States v. Pirro*, 212 F.3d 86, 91-92 (2d Cir. 2000) (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir. 1975)); see also*, United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). Moreover, when the definition of an offense includes "'generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species, -- it must descend to particulars.'" *Russell,* 369 U.S. at 765 (quoting *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L. Ed. 588 (1876)).

In addition to the failure to charge elements required by 18 U.S.C. §§ 2339B(d)(1)(D) and (E), the indictment is defective because it fails to contain all of the other elements of the offense, fails to state essential facts, fails to state the time and place with sufficient particularity, and fails to contain sufficient precision to adequately inform the defendant of the charges he must meet and with enough detail to enable him to plead double jeopardy in a future prosecution based on the same set of events:

  i. **There is insufficient precision with respect to the *mens rea* element in Counts 1 and 2**.

In the peculiar circumstance of a §2339B prosecution, the generic term "knowingly" must descend to the particulars.

18 U.S.C. §2339B specifies that, to violate the statute, the defendant must have knowledge of at least one of three different and specific facts: "knowledge that the terrorist organization is a designated terrorist organization"; "that the organization has engaged or engages in terrorist activity"; or "that the organization has engaged or engages in terrorism" (with key terms in each phrase defined with reference to other designated statutes). Counts 1 and 2 allege only that the defendant "knowingly and intentionally conspired to provide" and "knowingly and intentionally provided" material support and resources to al-Shabaab; the counts

do not specify the fact on which knowledge regarding the alleged terrorist organization is premised – *i.e.,* whether the alleged knowledge is based on the designation or the activities of the "foreign terrorist organization."

Cryptically alleging only the word "knowingly," the indictment "requires the defendant to go to trial with [a] chief issue undefined," *Russell,* 369 U.S. at 766. Specification of the particular fact the defendant is alleged to have known is essential because defendant has the constitutional right to be informed of the nature of the charges, and lack of particularity unconstitutionally impairs his ability to intelligently prepare his defense. Specification of the fact the defendant is alleged to have known also is required because it ensures that defendant "is being tried on the evidence presented to the grand jury", that "the grand jury acted properly in indicting him," and "that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Pirro,* 212 F.3d at 92 (citations omitted).

      ii. **The time span alleged in each substantive count is vast** ("[i]n or about and between December 2008 and August 2012")**, the place indeterminate** ("within the extraterritorial jurisdiction of the United States")**, and the conduct imprecise; in addition, Count 1, the conspiracy count, is defective because it fails to charge an overt act, and Count 3, the firearms count, is defective because it is duplicitous:**

Count 1 alleges that the defendants conspired to provide material support to a foreign terrorist organization. In *United States v. Mostafa,* (SDNY, Docket No. 04cr356), another case in this Circuit involving a §2339B conspiracy, the government submitted and the court held that commission of an overt act is an essential element of a §2339B conspiracy (see *Mostafa,* ecf document 76 (Government Request To Charge) at 57; 2014 U.S. Dist. LEXIS 60825, *8 (SDNY 2014)). The indictment in this case fails to allege a single overt act. The conspiracy count also fails to provide adequate notice because the persons with whom the defendants allegedly conspired and the type of "material support and resources" that the defendants allegedly

conspired to provide are not fixed: the defendants allegedly conspired with each other and "together with [unidentified] others;" and, the support and resources alleged provided is identified as "*including*" but is not limited to "services, currency, weapons and personnel, including themselves." (Emphasis added.) [19]

Count 3, the firearms count is hopelessly imprecise and impermissibly duplicitous. The indictment charges the defendants -- together with unidentified "others," and in relation to and in furtherance of two separate crimes (*i.e.,* the conspiracy charged in Count 1 and the substantive offense charged in Count 2) -- with using and carrying, as well as possessing (and with aiding and abetting such using, carrying, and possessing) "one or more" firearms. This using, carrying and possession by unidentified persons of "one or more" firearms allegedly occurred "between December 2008 and August 2012" "within the extraterritorial jurisdiction of the United States." Without further specification, Count 3 also charges that "one or more" of the un-particularized firearms was allegedly "brandished and discharged" (when, where and by whom not specified), and that "one or more" of the firearms (carried or possessed by whom, when and where also not specified) was a machinegun.

In *United States v. Margiotta,* 646 F.2d 723, 733 (2d Cir. 1981), the Court explained, "An indictment is duplicitous if it joins two or more distinct crimes in a single count…. The policy considerations underlying the prohibition against duplicitous indictments are varied. As we previously have stated, these considerations include avoiding the uncertainty of whether a

---

[19] Similarly, Count 2, the substantive material support count – which charges the defendants with aiding and abetting under 18 U.S.C. § 2 -is inadequate in that it too alleges that the defendants acted "together" with unidentified "others," and, like Count 1, also identifies the support and resources defendants "together with others" allegedly provided as "*including*" but not limited to "services and personnel, including themselves."

general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution." (Citing, *United States v. Murray,* 618 F.2d 892, 896 (2d Cir. 1980)).

Without more specificity, defendant does not have adequate notice of the conduct he is accused of, and there is a grave risk that, in reaching a verdict, jurors will lack unanimity in several regards including: the predicate crime with which a firearm was used, carrying or possessed, etc.; the firearm at issue; whether the particular firearm was brandished or discharged or was a machine gun; the person who committed the crime as a principal and who was purportedly aided or abetted by the defendant.

Even if, arguably, the government may link multiple firearms to a single violent offense in a singe count, see *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir.), *cert. denied*, 510 U.S. 832 (1993), *United States v. Jackson*, 513 Fed. Appx. 51, 54 (2d Cir.) (Summary Order), *cert denied,* 133 S.Ct. 1848 (2013), here the indictment charges "one or more" firearms and multiple violent offenses in a single count.  At a minimum, the government should be required, prior to trial, to elect between the duplicitous charges and identify the firearm, the predicate offense, the principal, and specifically when and where the offense allegedly occurred.

    h.  **The Indictment Was Not Filed Within The Time Limits of 18 U.S.C.  §  3161(b).**

Mr. Yusuf was arrested and detained in Djibouti on or about August 5, 2012, without a warrant.  He was indicted on October 18, 2012, well over thirty days later.  In addition to violating the appearance and complaint requirements of Fed. R. Crim. P. 5, the government violated the Speedy Trial Act.

The arrest, subsequent detention, and interrogations by both Djiboutian officials and American officials, we contend, were all conducted as part of a joint venture between Djibouti and the United States. *See United States v. Yousef*, 327 F.3d 56, 145-146 (2d Cir. 2003). 18 U.S.C. § 3161(b) provides: "any ... indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested..." Since it does not appear that any of the periods of excludible delay set forth in 18 U.S.C. § 3161(h) apply, the indictment and superseding indictment must be dismissed pursuant to 18 U.S.C. § 3162(a)(1), and should be dismissed with prejudice.

2. **The Government Should Be Ordered To Provide Particulars**

By letter dated July 24, 2014 (ecf 89), we submitted a detailed request to the government seeking particulars. The government has ignored the request. Therefore, we move pursuant to Fed. R. Crim. P. 7(f) for an order directing the government to file a bill of particulars.

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (Citations omitted). A bill of particulars should be required where the charges of the indictment "do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (citing, *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir.) (mem.), cert. denied, 493 U.S. 834 (1989)).

The decision whether or not to grant a bill of particulars rests within the sound discretion of the district court. *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984). The exercise of the court's discretion, however, must be informed by the complexity of the charges. See, *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (principles announced in *Bortnovsky* "must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO.")

Where, as here, the statutes under which the defendant has been charged give the government wide latitude in framing the charges, the failure to particularize is more likely to hinder the defendant from preparing his defense, may allow shifts at trial that result in surprise to the defendant, may mask multiplicity and duplicity issues, and may preclude intelligent assessment of double jeopardy issues. See, e.g., *Bortovsky* (failure to provide particulars effectively shifted burden of proof to the defense; without specifically being informed of the dates of the allegedly phony burglaries and the identity of false documents, defendants were unable to prepare adequately for trial); *Davidoff* (indictment put Davidoff on notice that he would be obliged to defend against extortionate schemes directed at one company and companies associated with it in contemplation of a merger, but, at trial, defendant was confronted with evidence of extortions aimed at entirely different companies; Court finds it was "unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies").

Here, the Court's discretion should be exercised in favor of granting a bill of particulars. As set forth above in the previous point, the indictment covers an enormous time span and a vast geographic space but provides only the sparest level of detail regarding the charged conduct. Without particulars, (1) defendant is in the dark as to the specific type of knowledge he is alleged

to have had, the conduct he is alleged to have known about, and the acts of which he is accused, and (2) the government is in a position to advance bases for conviction that may shift throughout the trial and may well be different from the specific charges made in the indictment returned by the grand jury.

Counts Two and Three are especially problematic because of the uncertainty in the indictment as to who is the alleged principal and who is allegedly liable for the conduct of another, and if the latter, the act that forms the basis for liability.   According to the indictment, liability for these offenses derives from both 18 U.S.C. §§ 2339B (providing material support or resources to designated foreign terrorist organizations), 924(c)(1)(A)(ii) (brandishing a firearm during and in relation to a crime of violence), 924(c)(1)(A)(iii) (discharging a firearm during and in relation to a crime of violence), and 924(c)(1)(B)(ii) (use, carrying or possessing a machine gun in relation to a crime of violence), as well as 18 U.S.C. § 2 (entitled "Principals" but referred to colloquially as "the aiding and abetting statute").   18 U.S.C. §2 section has two subsections: (a) whoever commits an offense against the United States, "or aids, abets, counsel, commands, induces or procures its commission," is punishable as a principal; and (b) whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.

The government should be directed to identify each person allegedly involved in providing material support, and, with respect to each person, specify the act(s) and the knowledge that form the basis for his liability – both for the material support offense under §2339B, and for firearm offense under §924(c).   Mr. Yusf should not be forced to guess as to the specific acts of which he is accused, the acts of the persons for which he is allegedly vicariously liable, or the knowledge of which he is being held accountable.

3. **Motion *In Limine* For An Order Directing Government Witnesses Not Use To Use The Statutory Words And Phrases "Terrorist," "Terrorist Activity" Or "Terrorism"**

The Court should issue an order precluding any government witness– fact or expert - who testifies on the subject of the conduct of the defendant, al-Shabaab, or any other person or group, from using the terms "terrorist," "terrorist activity (or activities)," or "terrorism."   It should also preclude the introduction of any documentary or video evidence containing any of these words. These terms have many different meanings both in common parlance and within the U.S. Code.   They are, however, specifically defined in the statutes at issue in the case, and the jury will be charged with the legal criteria for finding whether they have been proved.  Use of the terms by the government's witnesses and presentation of the term in physical evidence is confusing, unnecessary, prejudicial, and inappropriate and should be precluded under Fed. R. Evid. 102, 401, 403, 702, 703 and 704.  The words are inflammatory and loaded, and regularly used in a discriminatory fashion as they "are used selectively by governments and media to describe those who resort to force in opposing government policies." *Tomis Kapitan & Erich Schulte, "*The rhetoric of `terrorism' and its consequences" (2002) 30:1 Journal of Political and Military Sociology 172 at 178; see also ibid, note 180 at 178 ("Because of its negative connotation, the `terrorist' label automatically discredits any individuals or groups to which it is affixed; it dehumanizes them, places them outside the norms of acceptable social and political behavior, and portrays them as people who cannot be reasoned with."); Kapitan, "*The Reign of `Terror,"* N.Y. Times, October 19, 2014, http://opinionator.blogs.nytimes.com/2014/10/19/the-reign-of-terror/?emc=eta1

The words also embrace ultimate legal issues to be decided by the jury.  Allowing the witnesses to loosely throw these words around not only poses a grave risk of prejudice, but also

47

threatens to usurp the court's role in instructing the jury as to the applicable law, and the role of the jury in applying the law to the facts before it.

In *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), the Court reversed the convictions because of the erroneous admission of precisely this kind of testimony. Reminding that the problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous legal standards to the jury, the Court found that the district court erred in allowing government expert witness in a securities fraud case to repeatedly use words like "manipulation," "scheme to defraud," and "fraud," *i.e.,* statutory and regulatory language that is not "self-defining," "subject of diverse judicial interpretation," and "indicating guilt". *Id.* at 140. The Court saw that the testimony was not helpful to the jury in carrying out its legitimate function. Rather, it was "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law.'" *Id.* (quoting *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied*, 464 U.S. 895 (1983)).

Similarly, in *Hygh v. Jacobs,* 961 F.2d 359 (2d Cir. 1992), the Court made it crystal clear that testimony expressing a legal conclusion – *whether explicitly or implicitly* – should be excluded: "This circuit is in accord with other circuits in *requiring* exclusion of expert testimony that expresses a legal conclusion. … Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard – explicit or implicit to the jury. Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Id.* at 363-4 (emphasis added).

Critical issues for the jury in this case are going to be what the defendant knew about al-Shabaab and its activities, and whether he knew that those activities were "terrorist" or

"terrorism" as those terms are specifically defined in the relevant statutes. The Court should preclude the government's witnesses from using these powerful and conclusory terms in order to insure that the court's function in instructing the jurors on the law is not usurped, the jurors are not misled, and the defendant is not denied a fair trial.

### 4. **Motion For Notice Pursuant To Fed. R. Evid. 404(b)(2).**

If its recent submissions are an indication, the government is bent on swamping the trial with irrelevant or, at best, marginally probative but highly inflammatory, prejudicial (and largely hearsay) evidence about gruesome conduct attributed to al-Shabaab. Defendant moves pursuant to Fed. R. Evid. 404(b)(2) for the prosecutors to provide notice before trial of each uncharged crime, wrong, or other act allegedly committed by defendant or others (including any person allegedly associated with al-Shabaab) about which they intend to offer evidence at trial, and the basis upon which it claims the evidence is relevant and admissible. Careful scrutiny of the basis for the claimed relevance of any other crimes evidence, and careful balancing between its probative value and prejudicial effect is essential.

Importantly, in ruling on admissibility, the court must take into account that, by statute, the defendants are *precluded* from challenging the designation of Al Shabaab as a foreign terrorist organization ("FTO").[20] If the defendant cannot challenge the designation, it is

---

[20] 8 U.S.C. § 1189(a)(8) states in relevant part:

> If a designation . . . has become effective . . . a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation or redesignation as a defense or an objection at any trial or hearing.

fundamentally unfair and a violation of due process to allow the government to support the designation.  Indeed, in cases where defendants have challenged 8 U.S.C. § 1189(a)(8) as a violation of due process, courts have emphasized that only the *fact* of an organization's designation is an element of 18 U.S.C. §2339B; the *"'validity* of the designation is not.'" *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157 (EDNY 2008) (quoting, *United States v. Hammoud*, 381 F. 3d 316, 331 (4th Cir. 2004)); *see also United States v. Afshari*, 426 F.3d 1150, 1158 (9th Cir. 2005).   Accordingly, the government has no need to validate the designation of al-Shabaab in this case with a parade of horrible "other crimes" evidence.

What the government is required to prove about al-Shabaab is in fact quite limited.  The only real issues for trial involve whether al-Shabaab was a designated FTO (a simple fact of which the court may take judicial notice), *what the defendants in fact knew about al-Shabaab, what the defendants did, and what crime, if any, they agreed to commit.*

Evidence about grisly activities attributed to others connected to al-Shabaab is not necessarily (and should not be considered presumptively) relevant.  Since such evidence is surely prejudicial, it should have no place in the trial, and should be excluded pursuant to Fed. R. Evid. 401 and 403, unless, at a minimum, the government can demonstrate that, when the defendants allegedly provided or conspired to provide material support to the organization, the defendants actually knew about such activities and knew their connection to al-Shabaab (and even then, the evidence may be unduly prejudicial, cumulative, time consuming, etc.).

Introduction of evidence of crimes by others – particularly horrific crimes – without any showing that the defendant either participated in or knew of those crimes – risks inflaming the jury and prejudicing the defendant. Flooding the trial with evidence of atrocities purportedly committed by other people associated with al-Shabaab  -- including, for example, evidence about

the shocking attack on the Westgate Mall in Nairobi, which occurred in September 2013, *a year after* the defendants were arrested and in which they played no part—serves no legitimate purpose.  The government obviously wants to inflame the jury and deflect its attention away from more important evidence actually relating to the defendants.   The court should not allow it.

5.  **Motion To Suppress Statements And Fruits Of Statements And Motions Related Thereto.**

In a letter to the Court dated November 6, 2014, we addressed several issues and requested several forms of relief relating to defendant's separately filed motion to suppress (ecf 101, in which the defendant also joined in the motions of the co-defendants) and motion to amend that motion (ecf 103).  Specifically, we moved for (1) an order granting the motions to suppress and precluding the government from using the statements – or the fruits of those statements – for any purpose including cross-examination of the defendants should they testify; (2) a taint hearing at which the government bears the burden of demonstrating that none of the evidence it seeks to produce at trial is the product of either the illegal interrogation or the illegal arrest; and (3) disclosure of the grand jury minutes pursuant to Fed. R. Crim. P. 6(3)(E)(ii).  We reiterate those requests for relief here, and incorporate the previous submissions by reference.

6.  **Defendant Yusuf Joins In The Pre-Trial Motions And Supporting Memoranda Of His Co-Defendants.**

## CONCLUSION

For the above stated reasons, each of defendant's pre-trial motions should be granted, and the relief identified in the Notice of Pre-Trial Motions should be ordered.  Oral argument on these motions is requested.

Defendant specifically reserves the right to make additional motions and to supplement any motions previously made based on any discovery that is provided, any decision on these motions, any other decision or ruling of the Court, and/or the results of further investigation.

Defendant also specifically reserves the right to make additional motions and to supplement any motions previously made based on any particulars ultimately provided by the government.

Finally, we renew our request for permission to file an oversized memorandum.  This request, made on November 17, 2014 (ecf 126), has, to date, not been ruled upon.


Dated:   New York, New York
         November 21, 2014

                              Respectfully submitted,


                              Jane Simkin Smith, Esq.
                              David Stern, Esq.

52